Charles MOYER, Individually, and as Personal Representative of the Estates of Ronald Moyer and Judy Moyer, Deceased, Donna Moyer, Individually, and as Personal Representative of the Estates of Ronald Moyer and Judy Moyer, Deceased and Leisurecraft, Inc., Appellants

v.

TELEDYNE CONTINENTAL MOTORS, INC., Teledyne, Inc. Superior Air Parts, Inc., Piedmont Hawthorne Aviation, Inc., a/k/a and/or f/k/a Piedmont Aviation Services, Inc., Piedmont/Hawthorne Aviation, Inc., and/or Piedmont Hawthorne Aviation, LLC and DivCo, Inc., Appellees.

Superior Court of Pennsylvania.

Argued Feb. 12, 2009.

Filed July 7, 2009.

Robert C. Daniels, Philadelphia, for appellants.

James E. Robinson, Philadelphia, for DivCo.

Douglas E. Winter, Washington, DC, for Teledyne.

Douglas H. Amster, Newark, NJ, for Piedmont Hawthorne.

BEFORE: FORD ELLIOTT, P.J., STEVENS, ORIE MELVIN, LALLY-GREEN, KLEIN, BOWES, PANELLA, DONOHUE and SHOGAN, JJ.

OPINION BY STEVENS, J.:

¶ 1 The instant matter is an action based on claims of negligence, breach of warranty and strict liability stemming from a single engine aircraft crash.[1] Appellants, the adult children of decedents Ronald Moyer and Judy Moyer, appeal from the trial court's Orders granting summary judgment in favor of Appellee Teledyne Continental Motors, Inc. (hereinafter "TCM"), and Appellee Piedmont Hawthorne Aviation, Inc., (hereinafter "Piedmont") and from the Order sustaining the preliminary objections of Appellee DivCo, Inc. (hereinafter DivCo).[2] Upon a review of the record, we affirm and find inapplicable the exceptions to the eighteen (18) year statute of repose established by the governing federal statute, the General Avia-tion Revitalization Act of 1994 ("GARA"), Pub.L. No. 103–298, 108 Stat. 1552 (codified as amended at 49 U.S.C.S. 40101, Note).[3]

¶ 2 In its Opinion filed pursuant to Pa. R.A.P. 1925(a), the trial court set forth the following factual background:

On January 26, 2003, Ronald and Judy Moyer were killed when their Beech V35B single engine aircraft crashed on a small island in the Delaware River. See [Appellants'] Response to TCM's Motion for Summary Judgment. The Moyers departed from Wings Field in Philadelphia, Pennsylvania and were en route to Columbia, South Carolina. *Id.* Ronald Moyer, a licensed pilot, was flying the plane. While in flight, Moyer reported a partial loss of engine power. *Id.* Although air traffic control directed Moyer to a local airport, Moyer radioed back he did not have enough power to make it to the airport. *Id.* Moyer landed on a small island in the Delaware, but unfor-

---

1. Appellants also raise a claim of "willful, deliberate, outrageous and wanton misconduct" against Appellee TCM only. *See* Count IV of Complaint filed 1/20/05, at 21.

2. Specifically, Appellants appeal the following Orders: The Order entered August 11, 2005, granting the Preliminary Objections of Appellee DivCo to Appellants' Complaint; the Order entered March 29, 2007, granting the Motion for Summary Judgment of Appellee Piedmont; and the Order entered on May 7, 2007, as amended on May 29, 2007, granting the Motion for Summary Judgment of TCM (the trial court originally had granted TCM's Motion on March 5, 2007, but later rescinded that Order upon Appellants' Motion for Reconsideration).

3. Also before us are two Applications for Relief of TCM. In the first filed on February 20, 2009, in which it avers that subsequent to the argument heard *en banc* on February 12, 2009, it obtained a copy of the unpublished Opinion handed down in *South Side Trust and Savings Bank of Peoria v. Mitsubishi Heavy Industries, Ltd., et al.*, Case No. 05 L 4052 (Ill. Circuit Court, December 22, 2008), and asks

this Court to consider it making a determination herein. In that case, the Court determined GARA's eighteen year statute of repose barred the Plaintiff's claims against the defendant and found the Engine Maintenance Manual did not constitute a "new component, system, subassembly, or other part of an airplane as a matter of law." We deny TCM's Application for Relief, as the cited Opinion pre-dates the oral argument by almost two months. Nevertheless, we note that even if we were to consider the case, TCM has acknowledged that Illinois Circuit Court Opinions are not published; therefore, we are obviously not bound by it, nor are we bound by decisions of the federal district court in Pennsylvania, even when federal questions are at issue. *See Kubik v. Route 252, Inc.*, 762 A.2d 1119, 1124 (Pa.Super.2000). In their second Application for Relief filed on April 1, 2009, TCM asks this Court to consider the Opinion handed down in *Burton v. Twin Commander Aircraft, LLC*, 148 Wash.App. 606 (2009). In light of our discussion, *infra*, this request is denied as moot.

tunately impacted trees on the way down which resulted in an explosion and fire that killed Mr. and Mrs. Moyer. *Id.*

At the time of the accident, the Moyer's [sic] aircraft contained an engine assembled by [Appellee] TCM (serial number 573483). TCM assembled and shipped the engine to Beech Aircraft in September, 1980. *See* Declaration of John S. Barton. Beech Aircraft then installed the engine on the aircraft and the aircraft was delivered to the original owner on April 8, 1982. *Id.* At the time of the accident, the crankcase[4] of the subject engine was a replacement, formerly in another TCM engine (serial number 519154). *Id.* TCM never inspected, repaired or modified either crankcase after the initial assembly. *Id.*

The crankcase in the aircraft at the time of the crash was repaired on previous occasions. On May 15, 1998, a crack was discovered in the original crankcase. See [Appellants'] response to TCM's Motion for Summary Judgment. The engine was sent to [Appellee] ("Piedmont") for repair. *Id.* Piedmont removed the crankcase and sent it to Appellee ("Div[C]o"), an FAA approved facility for repair. *Id.* Rather than repair the crankcase, Div[C]o replaced the crankcase and sent the replacement to Piedmont. Piedmont installed the Div[C]o crankcase in the subject aircraft. This replacement is the reason why the engine, at the time of the accident, contained a crankcase from an engine with a different serial number.

In November, 2002, the subject aircraft engine underwent additional repairs by a third party, Mr. Robert Cabaniss, Jr. Cabaniss performed a "top overhaul" of the engine, replacing cylinder assemblies and connecting rod bearings designed and manufactured by Defendant Superior Air Parts ("Superior"). *See* Cabaniss Deposition, pg. 73, 74, and 82. During the November, 2002 repair, a silicon sealant was applied to the cylinders of the crankcase by Cabaniss, assisted by Moyer. *Id.* at 109–110. The sealant was not on TCM's approved list of sealants for that engine.[FN2] *Id.*

FN2 The cause of this crash obviously is disputed by the parties. [Piedmont] asserts this improper sealant was the proximate cause of the crash but for purposes of the summary judgment motion argue[s], even accepting [ ] [Appellants'] contention that improper welding pursuant to TCM's improper welding instructions caused the crash, they have no liability.[5]

Trial Court Opinion, filed 8/17/07, at 2–3.

¶ 3 In August of 2005, DivCo, an Oklahoma corporation with its sole place of business in Tulsa, was dismissed from the instant action after it had filed Preliminary Objections to Appellants' Complaint asserting the trial court's lack of personal jurisdiction over it. Thereafter, TCM and Piedmont successfully moved for summary judgment, the former pleading several GARA provisions, and the latter claiming no party had advanced a theory of liability against it. This appeal followed, and in response to the trial court's Order entered on June 4, 2007, Appellants filed a statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b) on June 13,

---

4. A crankcase houses major engine components, is made of cast aluminum alloy, and is comprised of two matching parts which are joined along the vertical center plane. (See Permold Series Maintenance Manual, Appellants' Exhibit 8, at 20–3).

5. Another defendant, Superior Auto Parts, which manufactured the cylinder assemblies and rod bearings to which the adhesive had been applied, is not a party to this appeal.

2007, wherein they raised the following issues:

    1.  The [c]ourt erred in granting summary judgment in favor of [TCM] pursuant to the 18–year statute of repose contained within the General Aviation Revitalization Act of 1994, Pub.L. No. 103–298, 108 Stat. 1552 (codified as amended at 49 U.S.C. § 40101, Note) ("GARA") because TCM Service Bulletin M90–17 was issued on August 23, 1990 (12½ years before the accident), is considered a 'replacement part' under the cases interpreting GARA, and was a proximate cause of the crash that killed [Appellants'] decedents.

    2.  The [c]ourt erred in granting summary judgment in favor of [TCM] pursuant to GARA's 18–year statute of repose because [Appellants] have presented substantial evidence that [this Appellee] 'knowingly misrepresented to the Federal Aviation Administration, or concealed or withheld from the Federal Aviation Administration' required information that is causally related to the harm which [Appellants'] suffered, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party.

    3.  The [c]ourt erred in granting summary judgment in favor of ["Piedmont"] without permitting oral argument despite [Appellants'] specific request pursuant to Pa.R.Civ.P. 211.

    4.  The [c]ourt erred in granting summary judgment in favor of [Piedmont] because their sole argument, that 'no party has advanced a theory of liability against [it] and there are no expert reports criticizing [it],' was clearly erroneous as [Appellants'] maintenance expert opined that [this Appellee] violated Federal Aviation Regulation § 43.13 by using a crankcase that had a repair weld in a highly stressed area and that such conduct was a proximate cause of the fatal crash.

    5.  The [c]ourt erred in sustaining the preliminary objections of [DivCo] and dismissing [Appellants'] claims pursuant to Pa.R.Civ.P. 1028(a)(2) for lack of personal jurisdiction, because this [Appellee] at all times material hereto, maintained a highly 'interactive' webpage, admittedly directed its sales activities toward the Commonwealth of Pennsylvania, and sold its products and services to residents of the Commonwealth of Pennsylvania thus making the exercise of personal jurisdiction appropriate under 42 Pa.C.S. § 5301, *et seq.*, and the Due Process Clause of the Fourteenth Amendment.

■  ¶ 4 In an Opinion filed on August 20, 2008, a panel of this Court affirmed the trial court's Orders which are the subject of the within appeal. Thereafter, on October 23, 2008, that Opinion was withdrawn in this Court's *Per Curiam* Order which also granted a rehearing *en banc.*[6]

---

**6.** The Order further provided that each party shall either refile the brief it had previously filed together with a supplemental brief, if desired, or prepare and file a substituted brief. All parties have chosen to do the latter. As such, we note that a panel of this Court has concluded that on reargument, a petitioner may raise any issue in a supplemental or substituted brief that could have been raised before the original panel. In doing so, the panel stressed that prior appellate court decisions indicate scope limitations on the issues

to be considered are recognized when included either in a Supreme Court remand order or in this Court's order granting reargument. The panel cited to *ABG Promotions v. Parkway Publishing, Inc.,* 834 A.2d 613, 615 n. 2 (Pa.Super.2003) wherein this Court considered only those issues designated by it in the order granting en banc review and to Pa. R.A.P. 2546(b) in support of this statement. *R.W.E. v. A.B.K.,* 961 A.2d 161, 171 (Pa.Super.2008). Herein, this Court did not designate any specific issue in granting en banc

¶ 5 In their Substituted Brief on Reargument *En Banc*, Appellants raise the following four (4) issues for our review:

1. Are an aircraft engine manufacturer's Instructions for Continuing Airworthiness "Parts" of an aircraft such that their date of publication or amendment triggers the "rolling" 18–year statute of repose under the General Aviation Revitalization Act when they are required to be issued by the Federal Aviation Regulations and the engine could not exist without them?

2. Does uncontroverted evidence of a manufacturer's concealment of its secret in-house prohibition of welding critical areas of engine crankcases, which contradicts affirmative representations made to the Federal Aviation Administration and outside maintenance and welding facilities about the safety of welding crankcases in those critical areas, satisfy GARA's Knowing Misrepresentation, Concealment and Witholding Exception?

3. Does [Appellants'] expert's conclusion that an engine overhaul shop breached its duty of care in supplying a defective and improperly welded engine crankcase to a consumer satisfy the requisite quantum of proof under summary a judgment [sic] standard to establish a genuine issue of material fact as to that [Appellee's] liability under theories of negligence and strict liability?

4. May a Pennsylvania Court exercise personal jurisdiction over a foreign corporation that sells repaired aircraft engine crankcases which enters into over thirty transactions with Pennsylvania companies per year, generates over $30,000 in revenue from such sales per year, has at least 19–20 regular Pennsylvania customers, sends direct mailings to Pennsylvania residents, regularly purchases supplies through a Pennsylvania business, advertises on a national basis, and maintains an interactive website directed to existing and prospective Pennsylvania customers?

Appellant's Substituted Brief on Reargument *En Banc*, at 5. We will consider these issues in turn, and as the first two overlap, we will discuss them together.

¶ 6 Our standard of review for motions for summary judgment is well settled:

Pursuant to Pa.R.C.P. 1035.2(2), a trial court shall enter judgment if, after the completion of discovery, an adverse party who will bear the burden of proof at trial fails to produce 'evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to the jury.' *See Rapagnani v. Judas Co.*, 736 A.2d 666, 668–69 (Pa.Super.1999) (summary judgment properly granted when 'the record contains insufficient evidence of facts to make out a prima facie cause of action or defense, and, therefore, there is no issue to be submitted to a jury'). A motion for summary judgment is based on an evidentiary record that entitles the moving party to a judgment as a matter of law. *Swords v. Harleysville Ins. Cos.*, 584 Pa. 382, 389–90, 883 A.2d 562, 566–67 (2005). In considering the merits of a motion for summary judgment, a court views the record in the light most favorable to the nonmoving

review, thus, we will consider each one Appellant originally raised on appeal if it has

been properly preserved.

party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. *Hayward v. Medical Center of Beaver County,* 530 Pa. 320, 324, 608 A.2d 1040, 1042 (1992).

*Phillips v. Selig,* 959 A.2d 420, 427 (Pa.Super.2008), appeal denied, *Phillips v. Selig,* 600 Pa. 764, 967 A.2d 960 (2009). Furthermore, "[f]ailure of a non-moving party to adduce sufficient evidence on an issue essential to its case and on which it bears the burden of proof such that a jury could return a verdict in its favor establishes the entitlement of the moving party to judgment as a matter of law." *Zurich American Ins. Co. v. O'Hanlon,* 968 A.2d 765, 768 (Pa.Super.2009) (citation omitted).

■ ¶ 7 Appellants initially contend a manufacturer's instructions for continuing airworthiness constitute a part of the aircraft and are subject to GARA's rolling provision. Specifically, Appellants reason the trial court erred in refusing to find that Service Bulletin M90–17, issued by TCM in August of 1990 and containing "crankcase inspection criteria," constituted a replacement part as that term is defined under GARA, because the service bulletin is necessary for the operation of the airplane and is therefore tantamount to an instruction manual. Section 2 of GARA entitled "Time limitations on civil actions against aircraft manufacturers" reads as follows:

Under the General Aviation Revitalization Act of 1994,[FN1] claims for death, injury, and property damage involving certain types of aircraft asserted against manufacturers generally are barred if the accident occurred more than eighteen years after the delivery of the aircraft to the first purchaser. *See* GARA § 2(a) (prescribing that 'no civil action for damages for death or injury to persons or damage to property arising out of an accident involving a general aviation aircraft may be brought against the manufacturer of the aircraft or the manufacturer of any new component, system, subassembly, or other part of the aircraft, in its capacity as a manufacturer if the accident occurred ... after the applicable limitation period [of eighteen years]'). GARA, however, contains an express "rolling provision" that, while preserving the approach of foreclosing causes of action against manufacturers related to potentially defective aircraft replacement components after eighteen years, prescribes that the eighteen-year period commences upon the date of installation of such parts. *See* GARA § 2(a)(2) (providing that no civil action may be brought '[w]ith respect to any new component, system, subassembly or other part which replaced another component, system, subassembly, or other part originally in, or which was added to, the aircraft, and which is alleged to have caused such death, injury, or damage, after the applicable limitation period beginning on the date of completion of the replacement or addition'). The statute also includes an exception denying manufacturers repose in the event of misrepresentation, concealment, or withholding of essential information regarding performance, maintenance, or operation of an aircraft.[FN2] Further, GARA expressly preempts inconsistent state laws.

*See* GARA § 2(d).

---

FN1. Pub.L. No. 103–298, 108 Stat. 1552 (codified as amended at 49 U.S.C. § 40101, note) (hereinafter "GARA").

FN2. Specifically, under the exception covering misrepresentation, concealment, and withholding, the bar to the assertion of claims does not apply if:

[t]he claimant pleads with specificity the facts necessary to prove, and proves, that the manufacturer with respect to a type cer-

tificate or airworthiness certificate [for], or obligation[s] with respect to continuing airworthiness of, an aircraft or a component, system, subassembly, or other part of an aircraft knowingly misrepresented to the Federal Aviation Administration, or concealed or withheld from the Federal Aviation Administration, required information that is material and relevant to the performance or the maintenance or operation of such aircraft, or component, system, subassembly, or other part, that is causally related to the harm which the claimant allegedly suffered.

GARA § 2(b)(1).

*Pridgen v. Parker Hannifin Corp.*, 588 Pa. 405, 408–409, 905 A.2d 422, 424–425 (2006) adhered to on reargument by *Pridgen v. Parker Hannifin Corp.*, 591 Pa. 305, 916 A.2d 619 (2007). In addition, in the case upon which Appellants principally rely in their substituted brief, the Ninth Circuit has determined that flight manuals, which are required by federal regulation, could be considered a "new part" or a "defective system" of a helicopter as they contain the instructions necessary for its operation and are therefore deemed to be inseparable from it. In support of this finding, the Court cited federal regulations which specifically require the flight manual to contain information regarding an aircraft's gas tank and usable fuel supply. *See Caldwell v. Enstrom Helicopter Corp.*, 230 F.3d 1155, 1157 (9th Cir.2000).

¶ 8 Herein, there is no question that the aircraft in which Ronald and Judy Moyer were flying on the date of the accident had been delivered to the original purchaser in 1982, and the accident occurred in January of 2003, beyond the eighteen year limitation. Appellants attempt to avoid the claim of untimeliness by theorizing that the eighteen year period of repose began to run not from that initial transfer of the

airplane but from TCM's issuance of Bulletin M90–17 on August 23, 1990, wherein it modified its prior stance on crankcase welding and ushered a new, approved welding maintenance procedure. For the reasons discussed below, this argument has no merit.

¶ 9 As the trial court states in its Pa. R.A.P. 1925(a) Opinion, there is no authority from either the Pennsylvania state courts or the Third Circuit for the proposition that a service bulletin is the equivalent of a flight manual. Appellants argue *Caldwell, supra*, should govern this Court's analysis and reason that "[j]ust as Federal Aviation Regulations conditioned the existence of an aircraft on the issuance of a flight manual, the regulations condition the existence of an aircraft engine upon the issuance of Instructions for Continuing Airworthiness. The flight manual is relied on by the pilot to fly the aircraft safely, and the Instructions for Continuing Airworthiness are relied upon by licensed airframe and powerplant [sic] mechanics to keep the aircraft operating safely." Appellant's Substituted Brief on Reargument, *En Banc* at 24–25. Nevertheless, as the trial court notes, given the continual issuance of service bulletins pertaining to a variety of topics, "if the statute of repose [were] triggered every time a service bulletin was issued, the intent of GARA would be eviscerated." Trial Court Opinion, filed 8/17/07, at 6. The trial court distinguishes *Caldwell, supra*, from the circumstances herein by noting in the former the manual itself was defective for failing to supply critical information,[7] while in the latter, "it was not the service bulletin that failed but

---

7. In *Caldwell*, the Court noted that federal regulations require the manufacturer to supply a flight manual which is an integral "part" of the aircraft as it contains the instructions necessary to operate the aircraft,

and the plaintiff therein had alleged the defect in the flight manual to be the omission of any warning that the last two gallons of gasoline in the fuel tank were unusable.

the crankcase." Trial Court Opinion filed 8/17/07, at 6.

■ ¶ 10 In their second issue, Appellants attempt to attribute a defect to Service Bulletin M90–17 by contending the approval of welding as a method of crankcase repair expressed therein superseded for purely mercenary reasons the earlier bulletins which specifically disapproved weld repairs. Appellants assert TCM's alleged clandestine, in-house prohibition of welding critical areas of engine crankcases, which contravened affirmative representations it had made to the FAA and outside maintenance and welding facilities about the safety of welding crankcases in those critical areas, satisfies the knowing misrepresentation, concealment and withholding exception to GARA. Appellants thus conclude the trial court erred in granting summary judgment in favor of TCM because it "concealed from the FAA that it prohibited in house weld repairs of the same type that brought down the Moyers['] aircraft [and] that it represented to the FAA such welding practices were safe." Appellant's Substituted Brief on Reargument, *En Banc,* at 19 (emphasis removed).

¶ 11 After setting forth a summary of the history of Service Bulletin M90–17 in their Substituted Brief, Appellants opine that TCM's abrupt reversal of its longstanding crankcase welding prohibition stemmed from its interest in developing its remanufactured and factory overhauled engine business. Appellant's Substituted Brief on Reargument, *En Banc,* at 11–13. Specifically, in support of their accusation TCM knowingly concealed from the FAA its knowledge of the problem with the crankcase welding, Appellant cites to language in the relevant predecessors of SB M90–17 which read, in sum, that salvage welding of cracks in crankcase cylinder decks is an unsatisfactory means of repair.

Appellant's Substituted Brief on Reargument, *En Banc* at 11–12. As the reason for TCM's reversal of is former "strong recommendation" against welding crankcases, Appellants cite to an article published in the online August 2000 issue of AOPA Pilot Magazine, a trade publication of the Aircraft Owners and Pilots Association, wherein the following was stated:

> In contrast to the earlier bulletins, a paragraph in [M90–17] says, "[Teledyne] has established that welding of crankcases is an acceptable repair process. The weld procedure must conform to approved FAA repair procedures and dimensional integrity of the crankcase must be maintained."

> Why the change? Simply because [Teledyne] wanted to develop its remanufactured and factory overhauled engine business. Welding and refurbishing cases was necessary to be competitive.

Appellant's Substituted Brief on Reargument, *En Banc,* at 13. *Citing* "(Crank)case Closed: Crankcases get no respect" by Stephen W. Ells. As further proof of TCM's venality, Appellants point to an internal document called Engineering Drawing R632712–01–001, Revision D. which it asserts "secretly restricted crankcase welding to certain critical areas shaded" therein and was never provided to the FAA, and the fact that John S. Barton, a TCM witness, was instructed not to answer further questions concerning whether the FAA was privy to information contained therein during his deposition. Appellant's Substituted Brief on Reargument, *En Banc* at 13, 38.

¶ 12 Relying upon *Robinson v. Hartzell Propeller, Inc.,* 326 F.Supp.2d 631, 646–47 (E.D.Pa.2004), *appeal dismissed,* 454 F.3d 163 (3d Cir.(Pa.)2006), in its Opinion, the trial court asserts that "for the exception to apply, the plaintiff must prove (1) knowing misrepresentation, or concealment, or

withholding; (2) of required information that is material and relevant; (3) that is causally related to the harm [he] suffered." Trial Court Opinion, filed 8/17/09 at 7; however, as the trial court also notes, Appellants have not presented evidence that TCM knowingly misrepresented, concealed or withheld pertinent information from the FAA, nor have they met their burden of proving scienter, or active obstruction, or even of proving that the weld was done pursuant to the specific service bulletin at issue and caused the accident. Instead, Appellants argue that "[b]etween 1983 and 1990, the only event that took place to justify the removal of this strong warning against welding crankcases is a single engineering report concerning an engine crankcase study. [TCM] attempted to justify its dramatic course reversal with a single test where studs were merely pulled from the cylinder deck of the crankcase. The [Appellants'] expert, Donald Sommer, concluded that the [TCM] test was completely inadequate to justify reversing the long standing prohibition of crankcase welding." Appellants' Substituted Brief on Reargument, *En Banc* at 37. To the contrary, the Engineering Report reveals that TCM reviewed and evaluated twelve other tests conducted by Appellee DivCo. Also, Mr. John S. Barton, the individual in charge of the accident investigation department at TCM, testified that testing would be documented in engineering reports and that he was unaware of what additional testing may have been done in conjunction with the determination by TCM that welding was an acceptable repair process. Pretrial Examination of John S. Barton, 9/15/06, at 234–236.

¶ 13 Assuming, *arguendo*, that TCM conducted a single inadequate test prior to approving welding as an acceptable crankcase repair method, though, this circumstance would not create a reasonable inference TCM knew when SB M90–17 had been issued that welding of crankcases was not an acceptable repair process such that it misrepresented or attempted to conceal such information from the FAA. Moreover, while Appellants also assert TCM failed to provide engineering drawings to the FAA which prohibited welding in critical "shaded areas" while the Service Bulletin allowed for repair welding of crankcase cracks in any location, TCM does not dispute that the drawings contained errors and were corrected in an Engineering Notice issued in 2001, two years before the accident. *See* Substituted Brief of Appellees, [TCM] on Rehearing *En Banc* at 31–32.

¶ 14 Though the case is not binding upon this Court, the Washington Court of Appeals recently considered Appellants' first two issues on appeal, and the logic the court applied therein is instructive in the instant matter. In *Burton v. Twin Commander Aircraft, LLC*, 148 Wash.App. 606, 2009 WL 294815 *6 (February 9, 2009), the Court determined that a maintenance manual, unlike a flight manual, is not a "part" of an aircraft for purposes of GARA's rolling provision because:

[u]nlike a flight manual that is used by the pilot and is necessary to operate the aircraft, a maintenance manual is used by the mechanic and 'outline[s] procedures for the troubleshooting and repair of the aircraft.' Unlike the federal regulations that require the flight manual to be onboard the aircraft, Burton cited no requirement that the maintenance manual must be onboard. And unlike a flight manual, a maintenance manual as well as a service bulletin are used on and apply to different aircraft models.

*Burton, supra.* (internal citations and footnotes omitted). Nevertheless, the Court found the appellant Burton had created material issues of fact regarding whether the misrepresentation or concealment ex-

ception under GARA applied where statements made in two emails issued by the Vice President/General Manager of the appellee Twin Commander evinced that Twin Commander misrepresented or concealed the extent of the structural problems of the rudder system in an aircraft which had crashed and withheld critical information about that rudder system. *Id.* at *10.

■ ¶ 15 Thus, Appellant's first two claims fail.[8]

■ ¶ 16 Appellants next challenge the trial court's grant of summary judgment to Piedmont on the basis of the opinion of Appellants' expert, Mr. Allen Fiedler, that Piedmont did not perform its repair function in a manner which would satisfy FAA airworthiness standards. Specifically, Appellants allege that the use of a crankcase with a repair weld in a highly stressed area was a proximate cause of the crash. Appellants' Substituted Brief on Reargument, *En Banc,* at 44. Two provisions of Federal Aviation Regulation § 43.13 are relevant in this regard and read as follows:

(a). Each person performing maintenance, alteration, or preventive maintenance on an aircraft, engine, propeller, or appliance shall use the methods, techniques, and practices prescribed in the current manufacturer's maintenance manual or Instructions for Continued Airworthiness prepared by its manufacturer, or other methods, techniques, and practices acceptable to the Administrator ... He shall use the tools, equipment, and test apparatus necessary to assure completion of work in accordance with accepted industry practices. If special equipment or test apparatus is recommended by the manufacturer involved, he must use that equipment or apparatus or its equivalent acceptable to the Administrator.

(b) Each person maintaining or altering, or performing preventive maintenance, shall do that work in such a manner and use materials of such quality, that the condition of the aircraft, airframe, aircraft engine, propeller, or appliance worked on will be at least equal to its original or properly altered condition (with regard to aerodynamic function, structural strength, resistance to vibration and deterioration, and other qualities affecting airworthiness).

14 C.F.R. § 43.13(a) & (b).

¶ 17 Although the trial court accurately recounts Mr. Fiedler's testimony concerning Piedmont's compliance with section (a) of the regulation, Appellants assert Pied-

---

**8.** It should be noted that some of the arguments Appellants advance in their Substituted Brief on Reargument *En Banc* with regard to TCM do not appear in their Statement of Matters Complained of on Appeal filed pursuant to Pa.R.A.P. 1925(b). First, Appellants claim that even if Bulletin M90–17 is not a replacement part, their strict liability and negligence claims are not barred by GARA because they were not brought against TCM in its capacity as a manufacturer of the aircraft engine, but rather in its capacity as an engine rebuilder/overhauler. Appellants' Substituted Brief on Reargument *En Banc* at 31. They also assert that contrary to the trial court's finding, evisceration of GARA would ensue if Bulletin M90–17 were not found to be a replacement part or if TCM were not found liable for its tortious conduct. Appellants' Substituted Brief on Reargument *En Banc* at 30. Because these claims have no direct counterparts in Appellants' 1925(b) Statement, they are not before us. According to the bright-line rule set forth in *Commonwealth v. Lord,* 553 Pa. 415, 719 A.2d 306 (1998); "... in order to preserve their claims for appellate review, [a]ppellants must comply whenever the trial court orders them to file a Statement of Matters Complained of on Appeal pursuant to Pa.R.A.P. 1925. Any issues not raised in a Pa.R.A.P. 1925(b) statement will be waived." *Commonwealth v. Castillo,* 585 Pa. 395, 403, 888 A.2d 775, 780 (2005) *citing Lord,* 719 A.2d at 309. *Commonwealth v. McBride,* 957 A.2d 752, 755 (Pa.Super.2008).

mont's performance of maintenance was governed by 14 C.F.R. § 43.13(b). Appellants claim that "Piedmont's liability for the Moyer accident is based on its failure to identify the dangerous condition of the accident engine crankcase when it overhauled the engine and for returning such a defective engine to service. Worse, this crankcase was obviously welded twice and no instruction from anyone allowed that this twice welded crankcase could be returned to service." Appellant's Substituted Brief on Reargument, *En Banc*, at 44.

■ ¶ 18 However, Mr. Fielder explained that overhauls of the engine performed by Piedmont in 1992 and 1998,[9] were in accordance with TCM instructions and revealed crankcase cracks. In both instances the crankcases were sent to DivCo for repairs. The cracks were repaired by DivCo utilizing a weld process approved by TCM. The engine crankcase was returned to Piedmont after the weld repairs. Piedmont reassembled the engine with the repaired case in accordance with the TCM instructions and returned the engine to service as airworthy in both instances. Report of A.J. Fiedler, dated 11/17/06, at 7. Indeed, Mr. Fiedler also noted in his report that the aircraft had been overhauled, inspected, and certified as airworthy eleven months prior to the crash. Report of A.J. Fiedler, dated 11/17/06, at 4. Finally, and crucially, although Appellants rely on Mr. Fiedler's report to expound on

Piedmont's putative liability, that report actually undercuts their argument: in the findings which culminate his report, Mr. Fiedler never charges Piedmont with negligence, but rather only with relying, as it had been required to do by regulation § 43.13(a), upon TCM publications/instructions, and having "returned the engine to service in accordance with those instructions." Report of A.J. Fiedler, dated 11/17/06, at 13. Accordingly, we find that the trial court properly granted Piedmont's motion for summary judgment.[10]

■ ¶ 19 In their final issue, Appellants contend DivCo has sufficient contacts with Pennsylvania to establish general jurisdiction and, therefore, the trial court erroneously sustained DivCo's preliminary objections asserting the court lacked personal jurisdiction over it.

■ Our Supreme Court has opined that:

[p]reliminary objections should be sustained only in cases that are clear and free from doubt. In ruling on whether preliminary objections were properly sustained, an appellate court must determine whether it is clear [ ] from all the facts pleaded that the pleader will be unable to prove facts legally sufficient to establish a right to relief. There must exist a degree of certainty that the law will not provide relief based on the facts averred.

9. Apparently there were several welds in the crankcase, only one of which Appellants blame for the crash. However, despite Mr. Fiedler's seemingly definitive statement, it is not clear when and by whom the particular weld was performed, since, as noted, the accident crankcase was not an original part, but one which when installed, had "obviously [been] welded twice." (Appellants' Brief at 44).

10. Appellants also refer to a strict liability claim against Piedmont claiming that "a provider of maintenance can be subject to strict liability when it sells a defective product and is a seller under Section 402A of the Restatement (Second) of torts." See Appellants' Substituted Brief on Reargument *En Banc* at 44. Once again, as Appellants failed to set forth this issue in their Pa.R.A.P. 1925(b) statement, they have waived this issue. *See Lord, supra.*

*Uniontown Newspapers, Inc. v. Roberts,* 576 Pa. 231, 249–250, 839 A.2d 185, 196 (2003), *aff'd.,* 589 Pa. 412, 909 A.2d 804 (2006) (citation and quotations marks omitted). For Pennsylvania courts to acquire general personal jurisdiction over foreign corporations, one of the following must apply: the business must have been incorporated in Pennsylvania, must consent to the exercise of jurisdiction, or must carry on "a continuous and systematic part of its general business in the Commonwealth." 42 Pa.C.S.A. § 5301(a)(2). These same requirements extend to the acquisition of specific jurisdiction, "which has a more defined scope and is focused upon the particular acts of the defendant that gave rise to the underlying cause of action." *Taylor v. Fedra Int'l., Ltd.,* 828 A.2d 378, 381 (Pa.Super.2003). In either event,

> [i]n order to meet constitutional muster, a defendant's contacts with the forum state must be such that the defendant could reasonably anticipate being called to defend itself in the forum. Random, fortuitous and attenuated contacts cannot reasonably notify a party that it may be called to defend itself in a foreign forum and, thus, cannot support the exercise of jurisdiction. That is, the defendant must have purposefully directed its activities to the forum and conducted itself in a manner indicating that it has availed itself to the forum's privileges and benefits such that it should also be subjected to the forum state's laws and regulations.

*Id.*

¶ 20 Herein, the record established that DivCo is an Oklahoma corporation with its only facility in Tulsa, Oklahoma. All of DivCo's work is conducted in its Tulsa facility, and it has not performed any air-craft maintenance, repairs, or overhauls within Pennsylvania. DivCo has never had an office in Pennsylvania, nor is it licensed therein. In addition, DivCo has no suppliers in Pennsylvania, has no mailing address, telephone number, fax number or bank account in Pennsylvania, has never paid taxes in Pennsylvania and has never advertised in any Pennsylvania publication. Moreover, for the years 2003, and 2004, the percentages of DivCo's total sales in Pennsylvania were 1.4, and 1.16 respectively. *See* Affidavit of Sandy Jarvis[11] in Support of DivCo, Inc.'s Preliminary Objection, at ¶¶ 4–13. *See also* Deposition of Chuck Jarvis,[12] 7/26/05, at 97–98. Its number of Pennsylvania customers in 2003 was only twenty and in 2004 was just eighteen. *See* Deposition of Chuck Jarvis 7/26/05, at 68–69. In addition, though Mr. Jarvis testified that DivCo principally advertised in Trade–A–Plane, World Aviation, Millennium, Momentum, and GA Buyer, the first of which is a national publication, he could not indicate with certainty whether Trade–A–Plane is sold within the Commonwealth of Pennsylvania. *Id.* at 77. Such contacts are hardly "systematic and continuous."

¶ 21 Also, Appellants contend that DivCo "sends direct mailings to Pennsylvania, buys products from a Pennsylvania vendor, and maintains an Internet website accessible in Pennsylvania." Brief at 48. As DivCo notes in its brief, an Internet presence alone is insufficient to establish either general or specific personal jurisdiction, and where the assertion of jurisdiction rests on the existence of a website, a "sliding scale" analysis to determine jurisdiction is established "based largely on the degree and type of interactivity" on the site. *Mar–Eco, Inc. v. T & R and Sons Towing,* 837 A.2d 512, 516–517 (Pa.Su-

---

11. Sandy Jarvis was the current president of DivCo.

12. Chuck Jarvis was the general manager of DivCo.

per.2003). The *Mar–Eco, Inc.*, Court relied upon the following explanation of this interaction enunciated in *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F.Supp. 1119 (W.D.Pa.1997):

This sliding scale is consistent with well developed personal jurisdiction principles. At one end of the spectrum are situations where a defendant does business over the Internet. If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper. At the opposite end are situations where a defendant has simply posted information on an Internet web site which is accessible to users in foreign jurisdictions. A passive web site that does little more than make information available to those who are interested in it is not grounds for the exercise [of] personal jurisdiction. The middle ground is occupied by interactive [websites] where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the [website].

*Mar–Eco, Inc.*, *supra*, (*quoting Zippo, supra* at 1124 (citations omitted)).

¶ 22 In light of *Zippo*, the Third Circuit has also determined that for personal jurisdiction to exist, the defendant must clearly be doing business through its web site in the forum state, and the claim must relate to or arise out of use of the web site. *Toys "R" Us, Inc. v. Step Two, S.A*, 318 F.3d 446, 452 (3d. Cir.(N.J.)2003).

¶ 23 In *Mar–Eco, Inc.*, the appellant's customers "could use [its] website to apply for employment, search the new and used vehicle inventory, apply for financing to purchase a vehicle, calculate payment

schedules, order parts and schedule service appointments.... [Thus] the activity on the website was of a commercial nature that permitted extensive interaction with the host computer and would only serve to enhance [the appellant's] commercial business." *Id.* 837 A.2d at 517. This Court accordingly found the website provided a basis for general personal jurisdiction because the record demonstrated that it was "a highly interactive website with an exchange of information that permitted Waldorf to perform a significant amount of commercial business over the internet." *Id.* at 518. By contrast, this Court in *Efford v. The Jockey Club*, 796 A.2d 370 (Pa.Super.2002), concluded that a website which allowed the Pennsylvania owner of a thoroughbred horse to register the animal online but which was otherwise unconnected to or established within the Commonwealth did not have sufficient contacts to establish general jurisdiction. In addition, in *Accuweather, Inc. v. Total Weather, Inc.*, 223 F.Supp.2d 612 (M.D.Pa.2002), the Court determined that the mere presence of a website on the Internet and an accompanying e-mail link are not enough to subject an Oklahoma corporation which was not licensed to do business in Pennsylvania and did not own property or do business therein to personal jurisdiction in a Pennsylvania court.

¶ 24 In the case *sub judice,* as the trial court observed in its Opinion, the interactive portion of DivCo's website exists so that customers in need of a new crankcase can obtain general information regarding the company's inventory; Customers who have sent a crankcase for repair can check its status, although only its location in the repair system, not the technical details of the item, is available. *See* Deposition of Chuck Jarvis 7/26/05, at 53. In fact, Mr. Jarvis testified the customer information system had been developed "[s]o that cus-

tomers would not always call and ask where their crankcases were" and that DivCo sent out postcards to the existing 18–20 customers in Pennsylvania to alert them a new website existed "[s]o that customers would know they would not have to call in order to get the status of their crankcase.... That is really all the information that's available on the web site. We don't provide additional technical details about their crankcase, so, yeah, status." Deposition of Chuck Jarvis, 7/26/05, at 54, 80. The site cannot accommodate sales or orders, which must be placed over the telephone. Indeed, even e-mail transactions would be performed only for existing customers, and the billing would not be done electronically. Thus, the interactive aspect of the website at issue herein is no more intense than that in *Efford, supra.* As such, the trial court's order finding no personal jurisdiction should not be disturbed.

¶ 25 Applications for Relief Denied; Orders affirmed.

¶ 26 PANELLA, J., FILES A DISSENTING OPINION.

DISSENTING OPINION BY PANELLA, J.:

¶ 1 While the majority opinion provides a thorough analysis and presents a perceptive expression of rationale for its decision to affirm the trial court's entry of summary judgment in favor of TCM and Piedmont, I am obliged to dissent. As our standard of review dictates, after viewing the record in the light most favorable to the Appellants, as the non-moving parties, I would find that the trial court committed an error of law in granting summary judgment in favor of Piedmont. The record does not *clearly* show that no genuine issues of material fact exist. In addition, I am unable to conclude that reasonable minds cannot differ as to whether Pied-

mont performed its repair function in a manner which satisfied FAA airworthiness standards. The record ascertains that Appellants proffered the expert report of Allen J. Fiedler in support of their claim against Piedmont. In investigating the crash, and specifically the federal aviation regulations, Mr. Fiedler opined that

14 CFR Part 43.13 sets forth the performance rules such that each person performing maintenance or alteration of an engine shall use the methods, techniques and practices prescribed in the current manufacturer's maintenance manual or Instructions for Continued Airworthiness prepared by the manufacturer or other methods, techniques, and practices acceptable to the FAA. Furthermore, each person who maintains or alters an engine shall do work in such a manner that the quality and condition of the engine will be at least equal to its original or properly altered condition.... Piedmont being in the engine overhaul business among other aviation related activities, returned to service the subject engine after major overhaul. Piedmont utilized the TCM publications in effect at the time and returned the subject engine to service in accordance with those publications with inherent defects of a dangerous nature.

A.J. Fielder & Associates Report, 11/17/06 at 12. Further, Mr. Fielding stated that "the area on which the subject weld procedure was performed is a highly stressed area" and "welding should not be done in the highly stressed areas of a crankcase", as evidenced and supported by the NTSB in safety recommendations resulting from their investigations of cyclinder separation accidents. *Id.* Accordingly, it was Mr. Fielding's opinion that "the un-airworthy condition found in the subject engine crankcase is a direct cause of the separation of the # 2 cylinder of the subject

engine" which caused a "loss of significant engine power and ultimately shut down the engine." *Id.,* at 12. As such, Mr. Fielding believed that "the crankcase weld repair location resulted in an un-airworthy condition and this condition was the proximate cause of the accident, the deaths and the destruction of the subject aircraft." *Id.* at 13.

¶ 2 Based upon Mr. Fielding's proffered report, I am inclined to find that the decision of whether Piedmont's overhaul of the subject engine, and specifically the crankcase, left it in an unairworthy condition pursuant to FAA standards, and thus, a proximate or direct cause of the accident, should be left to the province of the factfinder upon receipt of additional factual evidence and expert testimony at trial. Based upon the foregoing, I find that a genuine issue of material fact exists and, as such, I do not believe summary judgment was warranted in favor of Piedmont.

¶ 3 Accordingly, I respectfully dissent.