HETZER–YOUNG et al., Appellants,

v.

PRECISION AIRMOTIVE CORPORATION et al., Appellees.

[Cite as *Hetzer–Young v. Precision Airmotive Corp.*,
184 Ohio App.3d 516, 2009-Ohio-5365.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 92422.

Decided Oct. 8, 2009.

Nurenberg, Plevin, Heller & McCarthy, Jamie R. Lebovitz, and Brenda M. Johnson; Landye Bennett Blumstein L.L.P. and Matthew K. Clarke; and The Wolk Law Firm, Philip J. Ford, Bradley J. Stoll, and Arthur Alan Wolk, for appellants.

Davis & Young, C. Richard McDonald, and Megan D. Novinc; and Perkins Coie, Mary P. Gaston, James N. Leik, and Clark R. Nichols, for appellee Precision Airmotive Corporation.

Thompson Hine L.L.P., and Elizabeth B. Wright, for appellees Elano Corporation and Unison Industries, L.L.C.

Bahret & Associates Co. and Robert J. Bahret, for appellee Johnson Aviation Company.

Wiles Boyle Burkholder & Bringardner and James M. Wiles, for the Textron defendants and Avco Corporation.

---

SEAN C. GALLAGHER, Presiding Judge.

{¶ 1} Plaintiffs-appellants, Rebecca Hetzer–Young et al.,[1] appeal the decision of the Cuyahoga County Court of Common Pleas that granted summary judgment in favor of (1) defendants-appellees Elano Corporation and Unison Industries, L.L.C., (2) defendants-appellees Lycoming Engines, a.k.a. Textron Lycoming Reciprocating Engine Division; Textron Systems Corporation; Avco Corporation; and Textron, Inc., and (3) defendant-appellee Precision Airmotive L.L.C.[2] For the reasons stated herein, we reverse the judgment of the trial court as to Elano Corporation and Unison Industries, L.L.C., we affirm the decision as to the other defendants-appellees, and we remand the matter for further proceedings.

**The Accident**

{¶ 2} This case arises from an airplane crash that occurred at the Lawrence County Airport in Chesapeake, Ohio, on March 15, 2005. The aircraft was a Grumman American AA–5. On board was Dr. Michael Young, who was the pilot; his daughter, Ginny Young; and her friend, Charles Lampe. All three on board died.

{¶ 3} According to the National Transportation Safety Board ("NTSB") factual report, the aircraft crashed shortly after takeoff. Eyewitnesses to the crash observed that Dr. Young made two attempts at landing the airplane. On the first approach, the aircraft appeared too high, and Dr. Young executed a "go-around" for a second approach. During the second approach, the aircraft appeared to be high, fast, and long down the runway. Engine power was heard being applied, the airplane continued in a "nose high," "steep climb" position, followed by the right wing dropping, a loss of power, and the plane descending nose first to the ground. A postcrash fire consumed a majority of the main wreckage.

**The Lawsuit**

{¶ 4} Appellants, who are representatives of the decedents' estates, maintain that the crash occurred as a result of a sudden engine failure at low altitude,

---

1. The plaintiffs-appellants include Rebecca Hetzer–Young, individually and as personal representative of the estate of Michael Young, deceased; Anise Nash, individually and as personal representative of the estate of Ginny Young, deceased; and Elizabeth Lampe, individually and as personal representative of the estate of Charles Lampe, deceased.

2. The trial court also purported to grant summary judgment in favor of Precision Airmotive Corporation. However, prior thereto, plaintiffs had voluntarily dismissed that defendant from the action.

because of a defect and failure in the aircraft's muffler and the carburetor engine component. They filed this wrongful-death, products-liability action against numerous defendants, including the manufacturer of the aircraft's muffler, Elano Corporation ("Elano"), which later merged into Unison Industries, L.L.C. (collectively, "Unison"); the manufacturer of the aircraft's engine, Lycoming, and certain companies associated with Lycoming (collectively, "Lycoming");[3] the product-line successor to the manufacturer of the carburetor for the engine, Precision Airmotive L.L.C. ("Precision");[4] as well as other parties who are not a part of this appeal.[5] In the complaint, appellants set forth claims for strict liability; negligence; misrepresentation; concert of action; and willful, wanton and outrageous conduct.

### The Aircraft

{¶ 5} The subject Grumman American AA–5 aircraft had an airworthiness date of July 16, 1974. Grumman American Aviation Corporation ("Grumman") sold the aircraft to its first purchaser, Firebird Aviation, around August 1974. Shortly thereafter, Firebird Aviation sold the aircraft to Harold L. Wylie. It is undisputed that at the time of the March 2005 accident, the aircraft was more than 30 years old.

### The Muffler

{¶ 6} Elano manufactured the muffler installed on the accident aircraft. The muffler was marked with the date code "04–74," demonstrating that it was manufactured by Elano in April 1974. Elano later merged into Unison.

---

3. These defendants-appellees include Lycoming, a.k.a. Lycoming Engines, a.k.a. Textron Lycoming Reciprocating Engine Division; Textron Systems Corporation; Avco Corporation; and Textron, Inc.

4. The manufacturer of the model MA–4SPA carburetor at issue was Marvel–Schebler, a division of Borg Warner Corporation. In 1983, the product line was sold to Facet Enterprises, Inc., which then transferred the assets to a related company, Facet Aerospace Products Co. ("Facet"). In 1990, Facet sold its aviation carburetor assets to Zenith Fuel Systems, Inc., and Zenith transferred those assets to Precision. Although not undisputed, Precision presumes for the sake of its motion that it has successor liability for the carburetor.

5. Appellants voluntarily dismissed their claims against the following defendants: Precision Airmotive Corporation; Precision Aerospace Corporation; Precision Aerospace Services L.L.C., f.k.a. Precision Aerospace Group L.L.C.; Precision Aviation Products Corporation; Precision Products L.L.C.; Zenith Fuel Systems L.L.C.; Burns International Services Corporation; Rogers Corporation; Dawley Corporation; Johnston Aviation Company; Tailwinds Aviation Services, Inc.; and Attitude Aviation, Inc. It is represented that the claims against Rogers Corporation and the claims against Johnston Aviation Company were settled. Also named as defendants were Burns International Services Company L.L.C.; Former Fuel Systems, Inc., f.k.a. Facet Fuel Systems, Inc.; Mark IV Industries, Inc.; and John Does 1 through 10.

{¶ 7} The engine logbook for the aircraft contains an entry dated August 28, 1987, that states "replaced muffler," which was entered by Edward Ramsey, an FAA-licensed airframe and powerplant ("A & P") mechanic. Appellants, through their experts, maintain that the logbook entry establishes that the original muffler was replaced with a new muffler. Appellants' theory of liability is that the aircraft experienced a sudden loss of engine power when the muffler's flame tube separated and blocked the exhaust.

{¶ 8} Unison challenges the admissibility of the engine-logbook entry and claims that the evidence is insufficient to establish that a new muffler was installed in 1987.

### The Engine and the Carburetor

{¶ 9} The aircraft engine was manufactured by Lycoming. Lycoming obtained a "type certificate" from the Federal Aviation Administration ("FAA") through a certification process that is intended to make sure that the aircraft meets the minimum standards for performance and safety set forth by the FAA.

{¶ 10} Federal aviation regulations require that "[t]he fuel system of the engine must be designed and constructed to supply an appropriate mixture of fuel to the cylinders throughout the complete operating range of the engine under all flight and atmospheric conditions." 14 C.F.R. 33.35(a). Lycoming conceded that "[f]or maintaining the flow limits on a particular carburetor as it is installed in the engine, that is our responsibility."

{¶ 11} The aircraft's engine was equipped with a Marvel–Shebler model MA–4SPA carburetor that was manufactured on or about February 22, 1974. The carburetor is a component of the engine. The primary function of the carburetor is to deliver the appropriate fuel/air mixture to the engine. The product line was eventually sold to Precision.

{¶ 12} The Lycoming engine, including the carburetor component, was shipped to Grumman on April 26, 1974, and thereafter was installed on the subject aircraft. The original engine and carburetor remained on the aircraft until the 2005 crash.

### The Float and the Open–Cell Defect

{¶ 13} The carburetor utilizes a float to help maintain the correct fuel level for delivery to the engine. The float on the subject aircraft was a Rogers composite Nitrophyl float.

{¶ 14} When Marvel–Shebler began manufacturing the carburetor in the 1930s, the floats were made out of metal. By 1961, the floats were being made out of composite materials.

{¶ 15} In the late 1970s, Marvel–Shebler began receiving reports that some composite floats were absorbing fluid. This resulted in the floats becoming less buoyant and sinking, thus affecting the carburetor's ability to control fuel flow.

{¶ 16} After Facet acquired the MA-series carburetor product line, Facet issued service bulletins in April and May 1984, indicating that composite floats could absorb fuel and directing aircraft owners to replace the composite floats with metal floats. The same year, Facet asked the FAA to issue an airworthiness directive ("AD") requiring aircraft owners to replace composite floats with metal floats.

{¶ 17} In response, the FAA issued a "notice of proposed rule making" that proposed the adoption of a new AD that would require the replacement of all composite floats with metal floats on all Facet (Marvel–Shebler) model carburetors. 49 F.R. 33694, effective August 24, 1984. The FAA expressed that "[t]he proposed AD is needed to prevent fuel absorption of the composite floats that causes an unsafe weight increase affecting fuel flow which could result in engine start fires or inflight engine stoppage." Id. The FAA sought comments from the manufacturers on the proposed AD.

{¶ 18} Appellants maintain that Lycoming and Marvel–Shebler/Facet discovered that the float-saturation problem was occurring due to an "open-cell" defect in the composite floats. Appellants claim that Lycoming and Facet misrepresented to the FAA that the reason for the float-saturation problem was the improper use of automotive fuels and concealed their knowledge that the composite floats suffered from an open-cell defect. The FAA withdrew the proposed AD on April 15, 1985. 50 F.R. 14716, effective April 15, 1985.

{¶ 19} In February 1990, an Alaska Superior Court judge found by clear and convincing evidence that Facet knew that some Model Nos. 30–628 and 30–759 Rogers composite floats contained an open-cell structure and that despite a lack of substantiating evidence, Facet represented to the FAA that auto gas had an adverse affect on the Rogers composite float. See *Palmer v. Borg–Warner Corp.* (Alaska 1992), 838 P.2d 1243, 1246. Lycoming was a party to that lawsuit.

{¶ 20} In 1990, Facet again requested the FAA for an AD mandating the replacement of the composite floats with metal floats. Facet continued to represent that it believed the saturation of the composite floats was due to the "use of low lead fuels and autogas" and also indicated that "there may be other causes for float saturation." This time, Lycoming supported the issuance of the AD. Neither Facet nor Lycoming disclosed an open-cell defect to the FAA. Further, Precision, after it acquired the MA-series carburetor product line from Facet, requested the FAA for an AD on September 5, 1991, but did not report an open-cell defect.

{¶ 21} Despite the requests to the FAA and the FAA's awareness that the composite floats were absorbing fuel, the FAA declined to issue an AD. In a letter to Precision dated July 8, 1992, the FAA concluded that "there was not a significant difference in the problems associated with the composite or metal floats and that regulatory action was not warranted at this time."

{¶ 22} The composite float on the subject aircraft was never replaced. Appellants' theory is that the float was one of the defective open-cell floats and that it was a cause of the engine failure and accident. Appellants maintain that had the FAA issued the proposed AD, the float on the subject aircraft would have been removed long before the accident.

### Summary Judgment and GARA

{¶ 23} Unison, Lycoming, and Precision all filed motions for summary judgment, asserting that appellants' claims against them were barred by the federal statute of repose under the General Aviation Revitalization Act of 1994, 49 U.S.C. 40101 ("GARA"). The trial court granted the motions.

{¶ 24} GARA is "an 18 year statute of repose for a civil action against an aircraft manufacturer for damages arising out of an accident involving a general aviation aircraft." H.R.Rep. No. 103–525 (1994), Part I, Pages 1–4, reprinted in 1994 U.S.C.C.A.N. 1638. GARA was enacted in response to a decline in the nation's general aviation aircraft manufacturing industry and was an attempt to revitalize the industry. Id. An important cause of the decline was attributed to the industry's increasing product-liability costs. Id. Thus, GARA was designed to limit excessive product-liability costs and to protect manufacturers from the long tail of liability, while at the same time affording fair treatment to persons injured in general aviation aircraft accidents. Id.

{¶ 25} GARA provides as follows:

Sec. 2. Time limitations on civil actions against aircraft manufacturers.

(a) In general. Except as provided in subsection (b), no civil action for damages for death or injury to persons or damage to property arising out of an accident involving a general aviation aircraft may be brought against the manufacturer of the aircraft or the manufacturer of any new component, system, subassembly, or other part of the aircraft, in its capacity as a manufacturer if the accident occurred—

(1) after the applicable limitation period [18 years] beginning on—

(A) the date of delivery of the aircraft to its first purchaser or lessee, if delivered directly from the manufacturer; or

(B) the date of first delivery of the aircraft to a person engaged in the business of selling or leasing such aircraft; or

(2) with respect to any new component, system, subassembly, or other part which replaced another component, system, subassembly, or other part originally in, or which was added to, the aircraft, and which is alleged to have caused such death, injury, or damage, after the applicable limitation period [18 years] beginning on the date of completion of the replacement or addition. GARA 2(a).

{¶ 26} There are also several exceptions for which the above statute of repose does not apply, including the following:

(1) if the claimant pleads with specificity the facts necessary to prove, and proves, that the manufacturer with respect to a type certificate or airworthiness certificate for, or obligations with respect to continuing airworthiness of, an aircraft or a component, system, subassembly, or other part of an aircraft knowingly misrepresented to the Federal Aviation Administration, or concealed or withheld from the Federal Aviation Administration, required information that is material and relevant to the performance or the maintenance or operation of such aircraft, or the component, system, subassembly, or other part, that is causally related to the harm which the claimant allegedly suffered. GARA 2(b)(1).

## The Appeal and Standard of Review

{¶ 27} Appellants have appealed the trial court's decision and have raised three assignments of error for our review, challenging the trial court's ruling on each of the motions for summary judgment.

{¶ 28} Appellate review of summary judgment is de novo. *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241. Summary judgment is proper when the moving party establishes that "(1) no genuine issue of any material fact remains, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and construing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made." *State ex rel. Duncan v. Mentor City Council,* 105 Ohio St.3d 372, 2005-Ohio-2163, 826 N.E.2d 832, ¶ 9, citing *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 364 N.E.2d 267; Civ.R. 56.

{¶ 29} Once a moving party satisfies its burden of supporting its motion for summary judgment with sufficient and acceptable evidence pursuant to Civ.R. 56(C), the burden shifts to the nonmoving party to set forth specific facts showing a genuine issue of material fact. *Todd Dev. Co., Inc. v. Morgan,* 116 Ohio St.3d 461, 2008-Ohio-87, 880 N.E.2d 88, ¶ 12; Civ.R. 56(E). "The language of Civ.R. 56 and our case law do not support the proposition that a party moving for summary

judgment has the burden to prove its case and disprove the opposing party's case as well." *Todd* at ¶ 13.

### First Assignment of Error—Unison's Motion

{¶ 30} Appellants argue that the trial court erred in granting Unison's motion for summary judgment under GARA.

{¶ 31} GARA bars actions against the manufacturer of an aircraft if the accident occurred 18 years after delivery to the first purchaser or lessee, or after the date of first delivery to a person engaged in the business of selling or leasing the aircraft. GARA 2(a)(1)(A) and (B). This, however, is subject to GARA's "rolling provision" that triggers a new 18–year period with respect to "any new component, system, subassembly, or other part which replaced another component * * * or other part originally in, or which was added to the aircraft, and which is alleged to have caused such death, injury, or damage * * *." GARA 2(a)(2).

{¶ 32} GARA acts as an affirmative defense and "creates an explicit statutory right not to stand trial." *Blazevska v. Raytheon Aircraft Co.* (C.A.9, 2008), 522 F.3d 948, 951. The party who raises an affirmative defense bears the burden of proving the defense. See *Todd Dev. Co., Inc.*, 116 Ohio St.3d 461, 2008-Ohio-87, 880 N.E.2d 88, ¶ 18–21; *N. Shore Auto Financing, Inc. v. Block*, Cuyahoga App. No. 82226, 2003-Ohio-3964, 2003 WL 21714583.

{¶ 33} The muffler installed on the accident aircraft bore a date stamp of "04–74," evidencing that it was manufactured by Elano in 1974. In 1974, Elano sold mufflers only to airframe manufacturers, such as Grumman, but it did not sell mufflers as replacement parts to end-users, such as pilots or aircraft service facilities. There is no dispute that the subject aircraft was delivered to its first purchaser in 1974 and was more than 30 years old at the time of the accident.

{¶ 34} Appellants argue that Unison was required to prove that the muffler on the accident aircraft was the original muffler in order to be entitled to GARA's first repose period. We are unpersuaded by this argument. Courts have recognized that GARA generally bars lawsuits that are brought against aircraft manufacturers more than 18 years after the delivery date to an initial purchaser of the aircraft. See *Burton v. Twin Commander Aircraft, L.L.C.* (2009), 148 Wash.App. 606, 221 P.3d 290; *Robinson v. Hartzell Propeller, Inc.* (C.A.3, 2006), 454 F.3d 163, 165; *Blazevska*, 522 F.3d 948, 952. Thus, insofar as appellants' action is based on a claim that any original components or systems failed, Unison has established that those claims would be barred by GARA 2(a)(1).

{¶ 35} However, GARA would not necessarily bar an action based on the failure of a replacement component or system. See GARA 2(a)(2). Therefore, to the extent that appellants claim that a new replacement part caused the accident, they have the burden of showing that the general repose period was restarted by GARA's rolling provision. See *Willett v. Cessna Aircraft Co.* (2006), 366 Ill. App.3d 360, 371–372, 303 Ill.Dec. 439, 851 N.E.2d 626. Unison was not required to prove its case and disprove the opposing party's case as well. See *Todd Dev. Co., Inc.*, 116 Ohio St.3d 461, 2008-Ohio-87, 880 N.E.2d 88, ¶ 13.

{¶ 36} In support of their argument that the muffler on the accident aircraft was not the original muffler, but was a new replacement part, appellants rely upon an entry in the aircraft's engine logbook, dated August 28, 1987, indicating "replaced muffler." They claim that the logbook entry is admissible evidence under either the business-records exception or the ancient-document exception to the hearsay rule. See Evid.R. 803(6); Evid.R. 803(16).

{¶ 37} The Ohio Supreme Court has set forth the business-record exception as follows: " 'To qualify for admission under Rule 803(6), a business record must manifest four essential elements: (i) the record must be one regularly recorded in a regularly conducted activity; (ii) it must have been entered by a person with knowledge of the act, event or condition; (iii) it must have been recorded at or near the time of the transaction; and (iv) a foundation must be laid by the "custodian" of the record or by some "other qualified witness." ' Weissenberger, Ohio Evidence Treatise (2007) 600, Section 803.73. Even after these elements are established, however, a business record may be excluded from evidence if 'the source of information or the method or circumstances of preparation indicate lack of trustworthiness.' Evid.R. 803(6)." *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 171.

{¶ 38} As to the first element, appellants presented evidence that the record was regularly recorded in a regularly conducted activity. Federal aviation regulations require an aircraft owner to keep and maintain engine-maintenance records and to transfer the records with the aircraft when sold. 14 C.F.R. 91.417 and 91.419. Paul Beegle, an FAA-licensed A & P mechanic, states in his affidavit that the system of recordkeeping in aircraft-engine logbooks, as controlled by federal regulations, is "standard across the aviation industry in the United States."

{¶ 39} Beegle provided maintenance and conducted inspections, including annual inspections, on the subject aircraft between 1975 and 1994, and as a regular business practice, he made entries in the logbook for the work he performed. He stated that he recognized the logbook attached to his affidavit as "a true and correct copy" of "the same engine logbook" in which he made his

maintenance entries. The engine logbook contained regular entries from July 16, 1974, to November 1, 2002.

{¶ 40} As to the second element, appellants presented evidence that the logbook entry was entered by a person with knowledge of the act, event, or condition. The logbook entry was dated August 28, 1987, and was entered by Ed Ramsey, an A & P mechanic. Beegle stated in his affidavit that he was familiar with Ramsey and had worked with him for a number of years. He recognized Ramsey's handwriting on the logbook entry that stated "replaced muffler." Beegle also verified work performed when he signed off on the aircraft's annual inspection later that same month.

{¶ 41} As to the third element, recorded at or near the time of the transaction, Beegle attested to making entries in the logbook "right after such work was performed." A review of the logbook itself reflects that the dates of the entries are consistent with the work performed.

{¶ 42} As to the fourth element, appellants presented a qualified witness to establish a proper foundation for the logbook entry. With respect to this element, the testifying witness must possess a working knowledge of the specific recordkeeping system that produced the document. See *State v. Davis* (1991), 62 Ohio St.3d 326, 342, 581 N.E.2d 1362. Contrary to Unison's argument, the "qualified witness" was not required to have personal knowledge of the logbook entry. See *Robinson v. Hartzell Propeller Inc.* (E.D.Pa.2004), 326 F.Supp.2d 631, 664, fn. 18 (recognizing that an "other qualified witness" who has familiarity with the recordkeeping system may testify to the foundational requirements). In *Davis*, the Ohio Supreme Court observed as follows: " 'While the witness need not have personal knowledge of the creation of the particular record in question, and need not have been in the employ of the company at the time the record was made, * * * he must be able to vouch from personal knowledge of the record-keeping system that such records were kept in the regular course of business.' " *Davis* at 342, quoting *Dell Publishing Co., Inc. v. Whedon* (S.D.N.Y.1984), 577 F.Supp. 1459, 1464, fn. 5.

{¶ 43} Here, Beegle attested to the standardized recordkeeping requirements for the engine logbook; he personally maintained the accident aircraft between 1975 and 1994; he made entries in the engine logbook; he was familiar with the mechanic who made the specific entry in question; and he verified the work performed. Thus, Beegle was a qualified witness with a working knowledge of the specific recordkeeping system that produced the entry in question and could attest to the foundational requirements of Evid.R. 803(6).

{¶ 44} With respect to the trustworthiness of these records, pursuant to federal aviation regulations, mechanics are not only required to make entries in the

maintenance records, but they are also prohibited from making false entries. 14 C.F.R. 43.9(a), 43.12(a)(1). Beegle indicated that because the recordkeeping system is standard in the industry and A & P mechanics are governed by the same federal aviation regulations, "any mechanic performing maintenance on an aircraft engine is able to accurately surmise any and all prior work performed on the engine, even if another mechanic performed such work."

{¶ 45} Nevertheless, Unison argues that the logbook is untrustworthy because a number of the logbooks are missing and the manner in which the subject logbook appeared casts doubt on its trustworthiness.

{¶ 46} Hetzer–Young testified at her deposition that while she was at her condo grieving, with numerous people surrounding her, including state policemen, a suitcase was located for her, and she was told that the FAA would be asking for it. Even though Hetzer–Young did not know who handed her the suitcase, there is nothing in the record to suggest that the logbook entry was fabricated. Further, Beegle, who is familiar with the engine logbook, is a "qualified witness" who can provide a sufficient foundation upon which to establish the trustworthiness of the subject entry.

{¶ 47} Unison claims that because the engine logbook from November 1, 2002, to the date of the accident is missing, there is no way of knowing whether the "replaced muffler" was the same muffler on the aircraft at the time of the accident.[6] Ironically, this argument apparently would support appellants' position that the muffler on the accident aircraft was not an original component part.

{¶ 48} Nevertheless, appellants presented evidence that there were no further muffler replacements. Nelson Witt, president of Attitude Aviation, testified at his deposition that his company performed maintenance on the subject aircraft from the day Dr. Young first brought the aircraft to the Lawrence County Airpark in 2004 until the day of the crash. He was not aware of any other maintenance being performed on the aircraft. He testified that Attitude Aviation never replaced the muffler, or even "worked on the exhaust system at all." He further testified that Attitude Aviation would have made entries in the aircraft's logbooks in connection with the work they performed and that the mechanics place logbooks back on the aircraft. There is no dispute that Dr. Young's aircraft caught fire after the crash.

{¶ 49} Upon our review, we find that sufficient evidence exists to establish the admissibility of the logbook entry under the business-record exception to the hearsay rule.

---

6. Beegle stated that it is common in the industry for a logbook to run out of pages and, in such situations, a new logbook is started.

{¶ 50} Appellants also claim that the logbook entry is admissible under the ancient-document exception to the hearsay rule. This exception provides that "[s]tatements in a document in existence twenty years or more the authenticity of which is established" are not excluded by the hearsay rule. Evid.R. 803(16). The requirement of authentication is satisfied "by evidence sufficient to support a finding that the matter in question is what its proponent claims." Evid.R. 901(A). By way of illustration only, an ancient document may be authenticated by evidence that a document "(a) is in such condition as to create no suspicion concerning its authenticity, (b) was in a place where it, if authentic, would likely be, and (c) has been in existence twenty years or more at the time it is offered." Evid.R. 901(B)(8).

{¶ 51} Here, the engine logbook has been in existence since 1974, and the 1987 logbook entry was in existence for more than 20 years at the time it was offered as evidence. It appears from the deposition testimony of Hetzer–Young that the logbook was located at Dr. Young's home following the accident and was handed to her in a suitcase with other aircraft documents. She specifically testified that the suitcase was "in my condo somewhere because they located it." The documents were forwarded to her attorney, who attested to making copies of the engine logbook. The engine logbook contained regular entries over a certain time period. It was readily identifiable as the aircraft's engine logbook through the testimony of Beegle, who was familiar with his entries and with the handwriting of Ramsey, who made the "replaced muffler" entry. We find that sufficient evidence exists to establish that the logbook entry is admissible as an ancient document.

{¶ 52} Notwithstanding the admissibility of the logbook entry, Unison argues that the logbook entry is insufficient to show that a "new" 1974 muffler was installed on the aircraft in 1987. Unison claims that the affidavits submitted by appellants speculate as to the meaning of the entry. We are unpersuaded by this argument.

{¶ 53} Appellants did not ask their experts to speculate about the meaning of the entry, but rather, they asked their experts what the entry indicated based on industry standards. Beegle explained that engine-logbook entries are nationally standardized and regulated so that each mechanic can ascertain precisely what work was performed by prior mechanics. He stated that the August 28, 1987 entry clearly indicates that the muffler was replaced with a new muffler and that under industry practice, a used muffler would not be replaced with a used muffler. He further indicated that if the muffler was not new, the entry would so reflect and a yellow tag would be required. Appellants also provided affidavits

from several other A & P mechanics [7] who stated, for the same or similar reasons, that the logbook entry indicated that a new muffler was put on the aircraft on August 28, 1987. Through these experts, appellants offered proof of the logbook entry's generally accepted meaning in the aviation industry. Appellants also offered evidence that although Elano sold mufflers only to airframe manufacturers, the airframe manufacturers distributed them as replacement parts, and the parts often would sit on shelves in inventory for years.

{¶ 54} We find that appellants presented sufficient evidence from which a reasonable jury could conclude that it is more likely than not that the muffler found on the accident aircraft, which is alleged to have caused the accident, was installed as a new replacement part in August 1987.

{¶ 55} Because genuine issues of material fact exist, the resolution of which may trigger GARA's rolling provision, Unison is not entitled to judgment as a matter of law. We express no opinion on the issue of proximate cause, as this issue was not before the trial court with respect to Unison's motion.[8] Appellants' first assignment of error is sustained.

### Second and Third Assignments of Error—Lycoming's Motion and Precision's Motion

{¶ 56} Appellants argue that the trial court erred in granting summary judgment in favor of Lycoming and Precision.

{¶ 57} The original engine and carburetor remained on the aircraft until the 2005 crash. Because the accident occurred 18 years after delivery of the aircraft to its first purchaser, appellants' claims against Lycoming and Precision are barred under GARA unless appellants are able to prove that a GARA exception applies. The relevant exception to the 18–year statute of repose applies when the manufacturer knowingly misrepresented, concealed, or withheld required information from the FAA that is material and relevant to the operation of the aircraft and is causally related to the accident. GARA 2(b)(1). Insofar as appellants contend that Precision was not a "manufacturer" of original equipment on the aircraft, the term "manufacturer" used in GARA has been applied to product-line successors. See *Mason v. Schweizer Aircraft Corp.* (Iowa 2002), 653 N.W.2d 543; *Burroughs v. Precision Airmotive Corp.* (2000), 78 Cal.App.4th 681, 93 Cal.Rptr.2d 124 (finding that under GARA, a product-line successor "stands in the shoes of" its product-line predecessors).

---

**7.** Appellants produced affidavits from A & P mechanics Allen J. Fiedler, Dennis A. Handley, Arthur Lee Coffman, and Larry K. Brown.

**8.** The trial court may still allow dispositive motions to be filed on the issue of causation.

{¶ 58} To establish the above exception, appellants must show "(1) knowing misrepresentation, or concealment, or withholding of material and relevant information, (2) that the manufacturer is required to give the FAA, (3) that is causally related to the accident." *Burton,* 148 Wash.App. 606, 221 P.3d 290; *Robinson,* 326 F.Supp.2d at 647.

{¶ 59} The first requirement to the exception requires evidence that Lycoming and Precision "knowingly misrepresented, or concealed, or withheld" material and relevant information from the FAA. "Knowingly" is defined as "[w]ith knowledge; consciously; intelligently; willfully; intentionally." Black's Law Dictionary (5th Ed.1979).

{¶ 60} The evidence in this case shows that the float-saturation problem was disclosed to the FAA and the FAA was aware that composite floats could absorb fuel and sink. However, appellants maintain that the cause of the float-saturation problem was misrepresented to the FAA as improper use of automotive fuels and that appellees concealed or withheld from the FAA their knowledge of an open-cell defect in the composite floats that was the actual source of the problem.

{¶ 61} Appellants presented exhibits showing that Marvel–Shebler/Facet discovered in the late 1970s that the float-saturation problem was occurring because of an "open-cell" structure in composite floats. While two of these exhibits pertain to polyurethane composite floats made by Sheridan Corporation, these exhibits nonetheless demonstrate an open-cell structure being a source of the fuel-absorption problem with certain composite floats. Further, the third exhibit specifically relates to Rogers composite floats. In that document, it was revealed that the cause of failed floats was "an open-cell structure" that caused the floats to absorb fuel, and was not because of any kind of chemical attack on their surface. While it was represented that the number of float failures was an extremely small percentage, it also was recognized that "their economic impact can be high because of product liability in the aviation carburetor application, particularly if the failures represent a trend." It was concluded that enhanced quality-control measures "should be sufficient to obtain zero defects," and as a result, "[t]here is no need to change this float in the M–S/T carburetors."

{¶ 62} As further evidence that Lycoming and Precision were aware that the Rogers composite floats were defective, appellants point to the 1990 Alaska Superior Court case in which the court determined that Facet had knowledge that Rogers composite floats contained an open-cell structure and that Facet had represented to the FAA that automotive fuel was the source of the problem, despite the fact that none of the tests conducted by Facet substantiated this determination. See *Palmer,* 838 P.2d at 1246 (quoting Alaska Superior Court

decision). Lycoming was a party to the litigation. See *Borg–Warner Corp. v. Avco Corp. (Lycoming Div.)* (Alaska 1993), 850 P.2d 628.

{¶ 63} Appellants assert that despite their knowledge of an open-cell defect being the cause of the problem with the composite floats, Lycoming and Facet did not disclose the defect to the FAA and continued to misrepresent to the FAA that automotive fuel was the source of the problem. They further state that Precision was made aware of the problem when it purchased the MA–Series carburetor product line in 1990 from Facet, because Precision would have acquired the report discussing the open-cell structure and Facet disclosed to Precision "all the significant information regarding" the composite floats.

{¶ 64} Brian Whitfield, who was involved in Precision's acquisition of the product line, testified that Facet told him that the "only problem" with the product line was "the float." Whitfield also testified that Precision had serious concerns about going forward with purchasing the product line "because of the Alaska float problem." The evidence reflects that Precision joined in the petitioning to the FAA to issue the AD, but did not disclose an open-cell defect. Precision also issued a service bulletin that was provided to the FAA that indicated that "composite floats may be absorbing fluid and sinking," but it did not disclose an open-cell defect in the float.

{¶ 65} The cases relied upon by Lycoming and Precision to suggest that appellants have failed to demonstrate a knowing misrepresentation or concealment in this matter are clearly distinguishable, because in those cases there was no evidence that the manufacturer knowingly misrepresented, concealed, or withheld material and relevant information from the FAA. See *Cartman v. Textron Lycoming Reciprocating Engine Div.* (Feb. 27, 1996), E.D. Mich. No. CV–72582–DT, 1996 WL 316575 (there was no proof that Rogers, as the supplier of the composite float, had communicated anything to the FAA or had a duty to do so, as Rogers was not a type certificate holder or a parts manufacturer approval ("PMA") holder); *Sheesley v. Cessna Aircraft Co.* (Apr. 20, 2006), D.S.D. No. 02–4185–KES, 2006 WL 1084103 (although Cessna may have disagreed with the FAA on how to solve the exhaust-system failure, the evidence showed that the exhaust-system problems were disclosed to the FAA); *Rickert v. Mitsubishi Heavy Industries Ltd.* (D.Wyo.1996), 923 F.Supp. 1453 (the facts indicated only a "difference of opinion" concerning proper design, and no specific facts were proffered to show that Mitsubishi knowingly misrepresented the aircraft's controllability characteristics to the FAA); *Moyer v. Teledyne Continental Motors, Inc.* (Pa.Super.2009), 979 A.2d 336, 346 (the court found that "a single inadequate test prior to approving welding as an acceptable crankcase repair method * * * would not create a reasonable inference [that the defendant] knew * * * that

welding of crankcases was not an acceptable repair process such that it misrepresented or attempted to conceal such information from the FAA").

{¶ 66} In the *Rickert* case, following remand, the court reversed its earlier decision and denied summary judgment after the plaintiff presented new evidence — affidavits asserting that the defendant deliberately kept problems with the de-icing system from the FAA. *Rickert v. Mitsubishi Heavy Industries Ltd.* (D.Wyo.1996), 929 F.Supp. 380. In *Moyer,* which was filed as supplemental authority herein, the court referred to *Burton,* 148 Wash.App. 606, 221 P.3d 290, wherein material issues of fact were created regarding the GARA exception where statements made in two e-mails issued by the vice president/general manager of the appellee Twin Commander evinced that Twin Commander misrepresented or concealed the extent of the structural problems of the rudder system in an aircraft that had crashed and withheld critical information about that rudder system.

{¶ 67} Likewise, in *Robinson,* 326 F.Supp.2d at 659, the court found that evidence submitted by the plaintiffs created a genuine issue of material fact as to whether a knowing misrepresentation or concealment was made in communications with the FAA regarding the actual cause of numerous propeller failures. The plaintiffs in *Robinson* maintained that Hartzell concealed the source of the high damaging vibratory stresses, which caused propeller failures, and blamed other factors. The *Robinson* court rejected the defendant's reliance on *Rickert* and found that "[a]lthough this Court agrees that 14 C.F.R. § 21.3 does not require a manufacturer to report 'all differences of opinion,' this regulation requires a type certificate holder to report failures, investigate failures, and report design defects to the FAA." *Robinson* at 658.

{¶ 68} We find that the evidence in this case is sufficient to demonstrate more than a mere "difference of opinion" as to the cause of the float-saturation problem. Appellants presented evidence that Lycoming and Precision were aware that an open-cell structure was the cause of the problem, not automotive fuel; that representations were made to the FAA that automotive fuel was the source of the problem; and that an open-cell defect was not disclosed to the FAA. Under these circumstances, we conclude that the evidence is sufficient to raise a genuine issue of material fact as to whether Lycoming and Precision knowingly misrepresented, concealed, or withheld the actual cause of the float-saturation problem.

{¶ 69} To meet the second requirement of the exception, appellants must show that the open-cell defect was information required to be submitted to the FAA. Appellants argue that Lycoming, as the engine's type certificate holder, and Precision, as a parts manufacturer approval ("PMA") holder for the carburetor, both had a duty to report their knowledge of the defect under 14 C.F.R. 21.3.

This section places an affirmative obligation on such parties to "report any failure, malfunction, or defect in any product, part, process, or article manufactured by it that it determines has resulted in any of the occurrences listed in paragraph (C) of this section." Id. Additionally, appellants argue that Precision is obligated to report defects to the FAA as a certified repair station pursuant to 14 C.F.R. 145.221. See *Long v. Muncie Aviation Co.* (Dec. 5, 2008), Ill.Cir.Ct. No. 06 L 006992, at 19.

{¶ 70} Precision contends that it had no duty to disclose its knowledge of the defect because the float was not "manufactured by it" and Precision never made the "determination" described in 14 C.F.R. 21.3. Lycoming makes a similar argument. We find no merit to their position. As found in *Burroughs*:

> Precision, as the holder of the PMA on the Marvel–Schebler line of carburetors, was obliged to comply with these reporting requirements even though technically the particular model of carburetor in question here was not "manufactured by it." * * * Again, after Precision took over the Marvel–Schebler carburetor line in 1990, * * * [i]n the eyes of the FAA, Precision was the "new manufacturer" of the Marvel–Schebler carburetor.

78 Cal.App.4th at 693, 93 Cal.Rptr.2d 124.

{¶ 71} The reporting obligations under 14 C.F.R. 21.3 are broad and include an affirmative duty "to report failures, investigate failures, and report design defects to the FAA." See *Robinson*, 326 F.Supp.2d at 657; see also *Burton*, 148 Wash.App. 606, 221 P.3d 290. Furthermore, "the reporting obligation is ongoing and continuous." *Long*, Ill.Cir.Ct. No. 06 L 006992. As a matter of federal policy, "the FAA cannot fulfill its obligation to promote civil aircraft safety if information which may be highly relevant to safety is withheld in the first instance." *Butler v. Bell Helicopter Textron* (2003), 109 Cal.App.4th 1073, 1086, 135 Cal.Rptr.2d 762. Thus, the reporting requirements under 14 C.F.R. 21.3 impose a responsibility not only to report failures, but also to investigate failures and report to the FAA design defects that detract from flight safety.

{¶ 72} In this case, we find that any knowing misrepresentation, concealment, or withholding of information regarding the cause of the float-saturation problem and the open-cell defect involves information required to be disclosed to the FAA.

{¶ 73} To meet the third requirement of the GARA exception, appellants are required to show that any alleged misrepresentation or concealment was causally related to the accident. Appellants maintain that had the FAA been informed that the source of the float-saturation problem was not the improper use of automotive fuel, and had the open-cell defect been disclosed as the actual source of the problem, the FAA would have issued the AD requiring the removal of

composite floats from MA-series carburetors, which AD would have had the force of law and the aircraft could never have been approved for return to service after any annual inspection. See 14 C.F.R. 39.13, 43.11(a)(5). Appellants' theory is that the Rogers composite Nitrophyl float in the aircraft's carburetor was one of the defective open-cell floats and that it became saturated with fuel and sank, thus causing the engine failure and accident.

{¶ 74} Lycoming and Precision argue that there is no evidence that the FAA would have issued such an AD or that it would have been complied with. In declining to issue the AD, the FAA found no significant difference in the problems associated with composite and metal floats. Lycoming also states that service instructions for the carburetor required an overhaul every ten years, and any mechanic performing an overhaul after 1984 should have removed the 1974 composite float as required by the mandatory service bulletins. Finally, Lycoming and Precision argue that appellants failed to submit any admissible evidence that the accident was caused by a defect in the float and a failure in the aircraft's carburetor.

{¶ 75} At best, the disputed evidence in this case goes to the issue of whether the alleged misrepresentations or concealment was a cause of the float not being replaced on the accident aircraft. Our review reflects that appellants have failed to present evidence to support their theory that the accident aircraft contained a defective open-cell float and that a failure in the aircraft's carburetor caused the accident. GARA exceptions depend on establishing a causal connection to the accident.

{¶ 76} We are mindful that at the time the motions were filed, discovery was not completed. However, appellants did not submit any affidavits pursuant to Civ.R. 56(F), setting forth sufficient reasons for the lack of supporting affidavits to justify their opposition. See *Brown v. Balnius*, Richland App. No. 08 CA 47, 2009-Ohio-2671, 2009 WL 1600992. Further, the lack of evidence on appellants' theory of causation was raised in response to briefing below and was addressed at the hearing on the motions for summary judgment in the trial court. In this matter, it was incumbent upon appellants to come forward with some evidence to satisfy each of the required elements of GARA's 2(b)(1) exception.

{¶ 77} In support of their argument that they have met their burden with respect to the causation element, appellants rely upon the deposition and affidavit of William R. Twa. The deposition was not presented with respect to the summary judgment motions below. Further, Twa indicated at his deposition that he had not reviewed the information regarding the subject accident and he did not know what caused the accident. The affidavit of Twa offers nothing more than a conclusory statement of a causal relationship. We have previously recognized that "[i]t is improper for an expert's affidavit to set forth conclusory

statements or legal conclusions without sufficient supporting facts." *Holliday v. Ford Motor Co.*, Cuyahoga App. No. 86069, 2006-Ohio-284, 2006 WL 178011, ¶ 43.

{¶ 78} Appellants also refer to the expert reports of Dr. McSwain, D. Sommer, A. Fielder, and A. Coffman.[9] However, none of these experts offer any opinion that a carburetor failure caused the accident.

{¶ 79} We find that appellants have failed to present evidence showing that a defective float and failure in the carburetor caused the accident. The failure to demonstrate a genuine issue of material fact on the causation element is fatal to appellants' claim that the GARA exception applies.

{¶ 80} Accordingly, we find that the trial court properly granted summary judgment in favor of Precision and Lycoming. Appellants' second and third assignments of error are overruled.

**Conclusion**

{¶ 81} Unison, Lycoming, and Precision each filed a motion for summary judgment on the grounds that appellants' claims are barred by the 18–year statute of repose under GARA.

{¶ 82} With respect to Unison, insofar as appellants' claims relate to an original muffler, the action would be barred under GARA 2(a)(1). However, we find that genuine issues of material fact remain in dispute concerning whether a new muffler was placed onto the aircraft in 1987, the resolution of which may trigger GARA's rolling provision, GARA 2(a)(2). Therefore, Unison is not entitled to summary judgment under GARA.

{¶ 83} We reiterate that the issue of causation as it relates to Unison and the muffler component is not before us at this time. For purposes of GARA, proof of a causal connection is required when a party seeks to invoke an exception to GARA's 18–year statute of repose. Unison's motion involves the question of when the statute of repose was triggered. Appellants are not seeking to invoke any GARA exception as to Unison. Therefore, in opposing Unison's motion only, appellants were not required to present evidence showing that the muffler contained a defect or had a failure that caused the accident. We recognize that appellants still must establish proximate cause to ultimately prevail on their claims against Unison.

{¶ 84} With respect to Lycoming and Precision, appellants' claims relate to the original engine and carburetor and are barred under GARA 2(a)(1), unless a GARA exception can be applied. In order to invoke the exception under GARA

---

9. Insofar as any unsworn affidavits were submitted, unsworn statements are not appropriate evidence under Civ.R. 56(C). See *McKinley v. Standby Screw Machine Prods. Co.*, Cuyahoga App. No. 80146, 2002-Ohio-3112, 2002 WL 1348537.

2(b)(1), appellants are required to establish a causal connection between the alleged misrepresentation or concealment and the accident. Because appellants failed to present any evidence to support their theory that a defective float and failure in the carburetor caused the accident, Lycoming and Precision are entitled to summary judgment as a matter of law.

{¶ 85} Accordingly, we reverse the trial court's ruling with respect to Unison, we affirm the trial court's ruling in favor of Lycoming and Precision, and we remand the matter for further proceedings.

Judgment affirmed in part
and reversed in part,
and cause remanded.

McMONAGLE and BOYLE, JJ., concur.