**SHANK, Appellee,**

v.

**CHARGER, INC., Appellant.**

[Cite as *Shank v. Charger, Inc.,* 186 Ohio App.3d 605, 2010-Ohio-1129.]

Court of Appeals of Ohio,
Second District, Darke County.

No. 09–CA–03.

Decided March 19, 2010.

Garbig & Blinn, L.L.C., and Caroline R. Blinn, for appellee.

Lopez, Severt & Pratt Co., L.P.A., Jose M. Lopez, and Jonathan S. Zweizig, for appellant.

FAIN, Judge.

{¶ 1} Defendant-appellant, Charger, Inc. ("Charger") appeals from a judgment awarding plaintiff-appellee, Jeffrey Shank, $2,468.03, plus statutory interest, and attorney fees of $2,500. After a bench trial, the court concluded that Charger had breached its contract for repair of Shank's automobile, had committed negligence, and had committed an unconscionable act in violation of R.C. 1345.03(B)(6).

{¶ 2} Charger contends that the trial court erred in overruling its motion in limine to preclude the testimony of Shank's expert. Charger also contends that the trial court erred in finding that it committed an unconscionable act.

{¶ 3} We conclude that the trial court erred in admitting a narrative statement about repairs that were made to Shank's truck, because Shank failed to comply with the requirements for establishing the business-record exception to hearsay under Evid.R. 803(6). Any error in admitting the evidence was harmless, however, because the opinion of Shank's expert was not exclusively, or even primarily, based on the repair estimate, but was supported by other facts in evidence, many of which are not disputed.

{¶ 4} We further conclude that the trial court did not err in awarding attorney fees to Shank under R.C. 1345.09(F)(2). Sufficient evidence existed to support the trial court's finding that Charger committed an unconscionable act under R.C. 1345.03(B)(6). Accordingly, the judgment of the trial court is affirmed.

I

{¶ 5} In the Spring of 2007, Jeffrey Shank purchased a 1999 Chevrolet Silverado truck from Ron Garrett Chevrolet. At the time, the Silverado had been driven about 49,000 miles. Before Shank purchased the truck, new brake pads and rotors were put on the rear of the truck, because the brake rotors were very rusty. This is apparently a common issue with Ford, Chevrolet, and Dodge trucks.

{¶ 6} After Shank purchased the truck, he had no problems with the brakes. In mid-August 2007, Shank took the truck to Auto Lube for its first service. Auto Lube is owned by Charger. Shank took a seat in the customer-service area, which was about six feet away from the bay where his truck was parked. Shank watched while the truck was being serviced.

{¶ 7} During the service, Jason Crank, an Auto Lube employee, accidentally grabbed a bottle of power-steering fluid and poured two to four teaspoons into the brake fluid. Both fluids are clear and look the same, but power-steering fluid is lighter and would float on the top of the brake fluid. Power-steering fluid is oily and contains petroleum.

{¶ 8} Keith Fourman, the assistant manager, noticed that Crank was pouring steering-wheel fluid into the brake reservoir. Shank saw the incident happen, and heard Fourman call out to Crank that he was inserting the wrong fluid. Fourman immediately got a vacuum pump that is similar to a turkey baster, and suctioned out the fluid in the master cylinder. Fourman also used a shop rag and his fingers to try to get the oil out. Fourman wiped out as much as he could, and filled the reservoir with brake fluid.

{¶ 9} Auto Lube did not have a written policy in place to deal with situations in which fluids were put in the wrong reservoir. Auto Lube also does not keep brake cleaner or detergent on hand. Fourman indicated at trial that he could not say for sure whether he was able to remove all the power-steering fluid. The brake reservoir contains nooks and crannies that are difficult to reach.

{¶ 10} Fourman testified that he told Shank that he had gotten as much oil out as he could. He told Shank there should be no problem, as brake fluid and power-steering fluid do not mix. Fourman told Shank that he had fixed the problem, and did not recommend that Shank take his vehicle to a mechanic.

{¶ 11} Shank testified at trial that Fourman had said that he got all the fluid out, and that it would be all right. Shank did not call a mechanic, because of Fourman's representations. · He was not alarmed.

{¶ 12} After the brake fluid was refilled, an Auto Lube employee sat in the driver's seat of the truck, put the brake on, put the truck in drive, and pulled it out of the facility. Shank then left. From that time until early October 2007, Shank drove the truck without incident. Shank mostly drove back and forth to work—a distance of only a few miles. In early October, Shank drove the truck to Springfield, Missouri, to visit his daughter, who was in college. This was the first long trip he had taken since the oil change, and the drive took about ten hours. During the trip, Shank experienced significant vibration in the front of the truck on two different occasions, but was unable to find the cause. When Shank arrived in Springfield, his brakes were clearly dragging. The sensation was as if Shank had one foot on the brake and was trying to accelerate.

{¶ 13} The next morning, Shank took the truck to Thompson Sales, which is located in Springfield, Missouri, and is a General Motors Corporation ("GMC") dealer. Shank told Thompson that he had experienced intermittent vibration at high rates of speed, that the brakes were dragging, and that there appeared to be a brake problem. Shank picked up his vehicle the next day, after repairs were made. The total for the repairs, including a rental car, was $2,424.01. Thompson showed Shank the parts that were removed from the car. Shank saw rubber hoses and rubber brake components that were swollen, bent, and distorted. Shank did not bring the parts back to Ohio. Shank had no further problems with the brakes after the repair.

{¶ 14} According to expert testimony, the braking system is activated by pressing on the brake pedal. This compresses or pushes a piston or rod to the master cylinder. The master cylinder has two reservoirs, one for the front and one for the back. The pistons in the master cylinder are sealed with rubber seals.

{¶ 15} If a vehicle has an antilock-brake system ("ABS"), as Shank's truck does, the master cylinder pushes fluid through the ABS. The ABS also has pistons that move back and forth and release pressure and has multiple lines that go out to the four wheels, where there are calipers or wheel cylinders. The pressure goes out to the calipers, pushes the pistons out and puts friction on the brake rotor and pads, which makes the car stop. Various components in the brake system contain rubber, including the seals in the master cylinder, the seals in the antilock-brake module, the brake hoses, and the calipers or wheel cylinders.

{¶ 16} The service manual for the 1999 Silverado truck contains the following notice:

{¶ 17} "Using the wrong fluid can badly damage brake system parts. For example, just a few drops of mineral-based oil, such as engine oil, in your brake system can damage brake system parts so badly that they'll have to be replaced. Don't let someone put in the wrong kind of fluid."

{¶ 18} Shank's expert, Phillip Ayette, testified that any products containing petroleum, including mineral spirits, gasoline, engine oil, transmission fluid, or power-steering fluid, are possible sources of contamination in the brake system. When these contaminants interact with rubber, the rubber parts will swell and become distorted. Even a few drops can damage rubber components. Charger's expert, Glenn Knick, also agreed that if components are swollen or distorted, that would generally lead him to believe that there is contamination with a petroleum-based fluid like power-steering fluid.

{¶ 19} Ayette testified that the two proper methods of removing power-steering fluid from a brake reservoir are to (1) replace the master cylinder, if the vehicle has not left the bay and the brakes have not been touched or (2) take off the brake reservoir and clean it out with hot water and detergent or a product called "Brake Clean." If a brake reservoir contains even a small amount of power-steering fluid, sucking it out will not remove it. The fluid leaves a film, and the only way to get it off is to wash it. Furthermore, the brake reservoir has many little walls inside, and one would never be able to get it all out. According to Ayette, the methods used by Auto Lube were not adequate. Even a residue on the wall of the reservoir will cause the kind of catastrophic damage that occurred to Shank's truck.

{¶ 20} Ayette also indicated that a few drops might take a couple of months to damage the brake system, whereas a larger amount might cause damage within a week. Eventually, the entire system would be contaminated. Ayette stated that if a customer complained of vibration and brakes dragging, and the master-cylinder-reservoir cap were distorted, he would replace the ABS component, the master cylinder, the four calipers, and five hoses, and would flush out the system.

He indicated the cost of these repairs would be approximately $3,000, or more than Shank spent.

{¶ 21} In contrast, Charger's expert, Knick, testified that Charger's employees acted appropriately by vacuuming the fluid and wiping the reservoir. Knick indicated that if power-steering fluid remained in the reservoir, he would expect to see problems within a week or two. Knick concluded that the likely cause of the brake problem was moisture, rather than power-steering fluid. Moisture would cause rust in the system and cause the brakes to lock up, whereas power-steering fluid would cause the vehicle to have minimum or no braking power.

{¶ 22} After hearing the testimony, the trial court filed an entry concluding that Charger had violated R.C. 1345.03(B)(6) by committing an unconscionable act. After Charger requested findings of fact and conclusions of law, the trial court adopted the findings and conclusions submitted by Shank. The court also awarded Shank $2,468 in damages, and $2,500 in attorney fees. Charger appeals from the trial court judgment.

## II

{¶ 23} Charger's first assignment of error is as follows:

{¶ 24} "The trial court erred in overruling defendant's motion in limine as to the testimony of plaintiff's sole expert witness, Phil Ayette."

{¶ 25} Under this assignment of error, Charger contends that the trial court erred in admitting the testimony of Shank's expert witness, Phil Ayette, because Ayette's opinion was allegedly based solely on narrative statements in a document prepared by the dealership that repaired Shank's vehicle. Charger contends that the statements were hearsay that could not properly form the basis of Ayette's opinion.

{¶ 26} The statements in question are contained in Exhibit B, which consists of an affidavit of the records custodian for Thomson Sales, and invoices pertaining to the repair of Shank's truck. The specific statements challenged by Charger are as follows:

{¶ 27} "Test drove and found that brakes are indeed locking up. Performed inspection and found brake fluid contaminated with a foreign substance. Recommended replacement of all rubber brake system parts and flush all metal lines. Replaced front and rear calipers and brake line hoses, replaced master cylinder and abs valve block, replaced rear axle to body brake hose. Flushed all metal lines whil [sic] hoses were disconnected, refilled system and pressure bled all four brake positions. Retested and found no brake lockup while driving after repairs."

{¶ 28} Prior to trial, the court overruled Charger's motion in limine, which requested that the court preclude Ayette from testifying. Charger's counsel also objected during trial to Ayette's testimony.

{¶ 29} Shank argues that the information in Thompson's business records is not hearsay, pursuant to the business-record exception in Evid.R. 803(6). In order for a record to qualify for admission under this rule it must meet the following criteria:

{¶ 30} " '(i) [T]he record must be one regularly recorded in a regularly conducted activity; (ii) it must have been entered by a person with knowledge of the act, event or condition; (iii) it must have been recorded at or near the time of the transaction; and (iv) a foundation must be laid by the "custodian" of the record or by some "other qualified witness." ' * * * Even after these elements are established, however, a business record may be excluded from evidence if 'the source of information or the method or circumstances of preparation indicate lack of trustworthiness.' " *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, at ¶ 171, quoting Weissenberger, Ohio Evidence Treatise (2007), 600, Section 803.73.

{¶ 31} The first and third elements of the exception are satisfied here, because the affidavit of Thompson's service manager indicates that the records were prepared in the ordinary course of business, at or near the time of the events described. The fourth element is also satisfied, as the affidavit indicates that the service manager is the custodian of the records and has the authority to certify the records. However, the second element of the test is not established, because the service manager failed to provide any information about the individual who entered the information on the records and performed the service. Compare, e.g., *Hetzer–Young v. Precision Airmotive Corp.*, 184 Ohio App.3d 516, 2009-Ohio-5365, 921 N.E.2d 683.

{¶ 32} In *Hetzer–Young,* the Eighth District Court of Appeals concluded that the plaintiff had satisfied the second prong of the business-record exception by presenting evidence that a logbook entry about repairs was entered by a person with knowledge of the event. Id. at ¶ 40. The Eighth District noted that the records custodian had stated that he was familiar with the mechanic who entered the logbook entry, had worked with him for a number of years, and recognized the mechanic's handwriting on the entry. Id. In contrast, the affidavit from Thompson's sales manager provides no information whatsoever about the mechanic who performed the work.

{¶ 33} Accordingly, the statements in the narrative statement do not fit within the business-record exception, and are hearsay. The question remains, however, whether the court's error in admitting the evidence and allowing Ayette

to testify is prejudicial. For error to be reversible, the appellant must be prejudiced. *Hoskins v. Simones,* 173 Ohio App.3d 186, 2007-Ohio-4084, 877 N.E.2d 1008, at ¶ 21.

{¶ 34} After reviewing the trial transcript and the court's decision, we find no prejudice. Contrary to Charger's contention, Ayette's expert opinion was not based exclusively, or even primarily, on the statements in the repair report. The following facts are undisputed: (1) Auto Lube's employee improperly inserted two to four teaspoons of power-steering fluid into the brake reservoir, (2) power-steering fluid is petroleum based, (3) the GM manual for Shank's truck states that even a few drops of petroleum-based products can cause severe damage to the brake system, (4) the damage is caused by the interaction of the fluid with the rubber parts in the brake system, which causes the rubber parts to become swollen and distorted, (5) both brake fluid and power-steering fluid are clear and cannot be distinguished in appearance, (6) Auto Lube's manager could not say for certain that he was able to remove all the power-steering fluid from the brake reservoir, (7) fluid travels from the brake reservoir to the rest of the brake system when the brake pedal is pushed down, (8) an Auto Lube employee pushed down on the brake pedal before the truck left the premises, when he returned the car to Shank, (9) Shank experienced no problems with the brakes before the incident, (10) Shank drove the truck for minimal distances, mainly back and forth three miles to work, for several weeks after the incident, (11) problems can take several weeks to surface, depending on the amount of petroleum-based product that contaminates the brake system, (12) on the first long-distance trip after the incident, Shank experienced intermittent vibrations in the front end of the truck at high rates of speed, and noted that the brakes dragged on acceleration, (13) Shank reported these symptoms to the repair shop in Missouri, which replaced the ABS module, calipers, all rubber brake-system parts, and the master cylinder, (14) Shank was shown the distorted and swollen rubber parts, and reported this and the symptoms to his expert, and (15) Shank experienced no problems after the brake system was replaced.

{¶ 35} The testimony of Phillip Ayette indicates that he based his opinion on all these facts, not simply the narrative statement in Thompson's invoice. Ayette stated that Auto Lube did not properly clean out the system after the incident, that a few drops of power-steering fluid can cause the type of catastrophic damage observed in the truck, and that the symptoms indicated that the brake system had been contaminated. Ayette further stated that if a customer reported these symptoms to him, he would replace the entire brake system. Admittedly, Charger's expert had a different opinion. However, the trial court was entitled to credit Ayette's theory as to the cause of the damage, since it was

supported by facts properly admitted in evidence. Accordingly, any error in admitting the hearsay in the narrative statement is harmless.

{¶ 36} Charger's first assignment of error is overruled.

## III

{¶ 37} Charger's second assignment of error is as follows:

{¶ 38} "The trial court erred and acted contrary to law in finding defendant in violation of Ohio Consumer Sales Practices Act § 1345.03(B) in the absence of an intent to deceive."

{¶ 39} Under this assignment of error, Charger contends that the trial court erred in finding a violation of R.C. 1345.03(B), because there was no evidence that its employees intended to deceive Shank. The trial court awarded attorney fees pursuant to R.C. 1345.09(F)(2), which allows attorney fees to be awarded to the prevailing party for work reasonably performed, if a supplier has knowingly committed an act or practice that violates R.C. Chapter 1345. The trial court's award was based on a finding that Charger had committed an unconscionable act under R.C. 1345.06(B)(3), by making a misleading statement of opinion upon which Shank relied to his detriment.

{¶ 40} Charger contends that an "intent to deceive" is required, and that Shank failed to establish intent, because its employees did everything they could to remedy the situation and made no attempt to conceal facts from Shank.

{¶ 41} In reviewing a trial court judgment after a bench trial, we are "'guided by the presumption'" that the trial court's findings are correct." *Patterson v. Patterson,* Shelby App. No. 17–04–07, 2005-Ohio-2254, 2005 WL 1074809, at ¶ 26, quoting *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 79–80, 10 OBR 408, 461 N.E.2d 1273. We also may not substitute our judgment for that of the trial court where there is "competent and credible evidence supporting the findings of fact and conclusions of law rendered by the trial judge." 10 Ohio St.3d at 80, 10 OBR 408, 461 N.E.2d 1273. "'A reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court. A finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not.'" *Gevedon v. Ivey,* 172 Ohio App.3d 567, 2007-Ohio-2970, 876 N.E.2d 604, at ¶ 54, quoting *State v. Wilson,* 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264. "If the evidence is susceptible to more than one interpretation, we must give it the interpretation consistent with the trial court's judgment." *Cent. Motors Corp. v. Pepper Pike* (1995), 73 Ohio St.3d 581, 584, 653 N.E.2d 639. Furthermore, the trial court has discretion in deciding if attorney fees are warranted under R.C. 1345.09(F), and

we will not disturb the decision absent an abuse of discretion. *Pep Boys v. Vaughn*, Franklin App. No. 04AP–1221, 2006-Ohio-698, 2006 WL 350288, at ¶ 32, citing *Einhorn v. Ford Motor Co.* (1990), 48 Ohio St.3d 27, 548 N.E.2d 933.

{¶ 42} Under R.C. 1345.03(A), suppliers are prohibited from committing unconscionable acts. As applicable to the case before us, R.C. 1345.03(B) provides:

{¶ 43} "In determining whether an act or practice is unconscionable, the following circumstances shall be taken into consideration:

{¶ 44} " * * *

{¶ 45} "(6) Whether the supplier knowingly made a misleading statement of opinion on which the consumer was likely to rely to the consumer's detriment * * *."

{¶ 46} Relying on our recent decision in *Trutschel v. Kettering Med. Ctr.*, Montgomery App. No. 22816, 2009-Ohio-3302, 2009 WL 1914549, Charger contends that scienter is a necessary element for recovery under R.C. 1345.03. Charger further contends that we should apply traditional notions of scienter, which require an "intent to deceive."

{¶ 47} In *Trutschel*, we did not discuss the meaning of scienter. Following existing authority, we simply observed that violations under R.C. 1345.03 require scienter, whereas violations under R.C. 1345.02 do not. 2009-Ohio-3302, 2009 WL 1914549 at ¶ 31, citing *Bierlein v. Bernie's Motor Sales, Inc.* (June 12, 1986), Montgomery App. No. 9590, 1986 WL 6757.

{¶ 48} In *Bierlein*, we focused on the fact that R.C. 1345.03(B)(6) adds a "knowledge requirement." We then looked to the definition of "knowledge" in R.C. 1345.01(E), and observed that this definition "indicates to the court that the legislature did in fact intend that the prevailing consumer show the seller was actually aware he was committing an unconscionable act or at least establish some fact upon which such awareness could be inferred." 1986 WL 6757, *6.

{¶ 49} Similarly, R.C. 1345.09(F)(2) requires that a supplier "knowingly" commits an act or practice that violates R.C. Chapter 1345. Thus, the same standard applies whether one is establishing an unconscionable act under R.C. 1345.03(B)(6), based on the defendant's act of knowingly making a misleading statement of opinion, or is establishing entitlement to attorney fees under R.C. 1345.09(F)(2), which requires that the seller knowingly commit a violation of R.C. Chapter 1345. Furthermore, even if a plaintiff relies on R.C. 1345.02, which lacks a "knowing" or scienter requirement, the plaintiff would still have to establish that the defendant acted knowingly to recover attorney fees under R.C. 1345.09(F)(2).

{¶ 50} R.C. 1345.01(E) defines "knowledge" as "actual awareness," but stresses that "such actual awareness may be inferred where objective manifestations indicate that the individual involved acted with such awareness." Accordingly, the plaintiff need not show direct awareness, but awareness can be inferred from circumstances.

{¶ 51} After our decision in *Bierlein*, the Ohio Supreme Court addressed the issue of what "knowingly" means in the context of R.C. 1345.01(E). See *Einhorn v. Ford Motor Co.* (1990), 48 Ohio St.3d 27, 548 N.E.2d 933. In *Einhorn*, the Ohio Supreme Court rejected a line of cases that would require a showing that the defendant must not only violate the Consumer Sales Practices Act ("CSPA"), but must know that his actions violate the act. Id. at 29–30, 548 N.E.2d 933. The court instead concluded the following regarding the purpose of the CSPA:

{¶ 52} "[It] is better safeguarded by finding that 'knowingly' committing an act or practice in violation of R.C. Chapter 1345 means that the supplier need only intentionally do the act that violates the Consumer Sales Practices Act. The supplier does not have to know that his conduct violates the law for the court to grant attorney fees. * * *

{¶ 53} "* * * The language '* * * knowingly committed an act or practice that violates this chapter' requires that for liability to attach, a supplier must have committed a deceptive or unconscionable act or practice. This conduct must violate the Consumer Sales Practices Act. The statutory language does not state that the supplier must act with the knowledge that his acts violate the law, as appellee contends. 'Knowingly' modifies 'committed an act or practice' and does not modify 'violates this chapter.'

{¶ 54} "To find otherwise would deny attorney fees to consumers even though the supplier might have blatantly violated the Consumer Sales Practices Act. Such a conclusion flies in the face of the common-law maxim that ignorance of the law is no excuse.

{¶ 55} "Thus, pursuant to R.C. 1345.09(F)(2), a trial court may award a consumer reasonable attorney fees when the supplier in a consumer transaction intentionally committed an act or practice which is deceptive, unfair or unconscionable." (Citations omitted.) *Einhorn*, 48 Ohio St.3d at 30, 548 N.E.2d 933.

{¶ 56} The Ohio Supreme Court recently reaffirmed *Einhorn*, stating:

{¶ 57} "Although both parties acknowledge that under the CSPA a plaintiff need prove only that the defendant intended to commit the act of violation and not that the conduct was intended to violate the act, we reiterate that the 'knowing' commission of an act that violates R.C. Chapter 1345 does not mandate imposition of attorney fees. The trial court has the discretion to determine whether attorney fees are warranted under the facts of each case. Therefore, we

reaffirm *Einhorn* and hold that to establish a knowing violation of R.C. 1345.09, for an award of attorney fees, *a plaintiff need prove only that the defendant acted in a manner that violated the CSPA* and need not prove that the defendant knew that the conduct violated the law." (Emphasis added.) *Charvat v. Ryan,* 116 Ohio St.3d 394, 2007-Ohio-6833, 879 N.E.2d 765, at ¶ 27.

{¶ 58} The alleged misleading statement of opinion upon which Shank relied is Fourman's representation that he had removed all the power-steering fluid from the brake reservoir and that the brake system would be alright. Based on this representation, Shank thought there would be no problems, and he took no further action. Charger contends that attorney fees are not warranted, because Fourman had no intention to deceive Shank, or to conceal facts from him.

{¶ 59} In *Pep Boys,* the defendant's employees performed two separate repair jobs for an alleged oil leak on the plaintiff's car and told the plaintiff that the problems had been fixed. 2006-Ohio-698, 2006 WL 350288, at ¶ 2–6. Subsequently, the plaintiff's engine threw a rod due to lack of oil and had to be replaced. Id. at ¶ 9–10.

{¶ 60} A jury concluded that Pep Boys had committed negligence and had violated the CSPA. The trial court then awarded attorney fees against Pep Boys under R.C. 1345.09(F)(2). The Tenth District Court of Appeals affirmed, concluding that the jury verdict was not against the manifest weight of the evidence, due to evidence that Pep Boys had not fixed the problem, despite its representations. Id. at ¶ 21–25.

{¶ 61} The CSPA claim against Pep Boys was based on R.C. 1345.02, which does not require any type of scienter. However, the attorney-fee award against Pep Boys under R.C. 1345.09(F)(2) required a finding that the supplier knowingly committed a deceptive or unconscionable act. Id. at ¶ 33.

{¶ 62} Pep Boys argued that even if its mechanics had failed to properly locate and repair the oil leak, attorney fees were not appropriate, because none of the work was intentionally sub-par. The Tenth District concluded that while this was true, Pep Boys had committed two knowing violations of the CSPA, by making unqualified statements that it had fixed the oil leak when repairs had not been made, and by stating that it had found the oil leak when it knew that it had possibly not found the leak. Id. at ¶ 36–37. The Tenth District, therefore, held that the trial court did not abuse its discretion in awarding attorney fees to the plaintiff. Id. at ¶ 37.

{¶ 63} In the case before us, Shank testified that he was told that all the power-steering fluid had been removed and that there would be no problems. In contrast, Fourman testified that he told Shank that he had removed most of the fluid. Fourman also testified that he could not say for sure if he had removed all

the fluid. Fourman admitted that he could not reach every nook and cranny in the reservoir, and that it would have been difficult to reach every part of the reservoir with a shop rag.

{¶ 64} The act of stating that all the fluid had been removed, if true, was misleading, as was Fourman's opinion that the problem had been fixed, since even a very small amount of improper fluid can cause catastrophic problems. More importantly, even if Fourman had said that a small amount of fluid remained, that statement, in itself, would have been misleading, since Fourman also opined that no problems would occur. In this regard, we note that Fourman testified that he had never come across this particular situation before in his experience, and had no knowledge of the effect power-steering fluid has on the components of a brake system. In contrast, Shank's expert and the GMC manual both indicate that problems can occur if even a small amount of petroleum-based products are inserted into a brake system. Fourman, therefore, should not have represented that he had fixed the situation and that no problems would occur, since he admittedly did not know that this was true. Fourman intended to make this statement, which violates the CSPA.

{¶ 65} Accordingly, the trial court did not err in awarding attorney fees under R.C. 1345.09(F)(2). Shank was not required to show that Fourman acted with actual awareness, since actual awareness can be inferred in the case before us, based on objective indications.

{¶ 66} We note that in the case before us, Shank's complaint included claims based on both R.C. 1345.02 and R.C. 1345.03. The trial court chose to base its decision on a violation of R.C. 1345.03(B)(6), but the court could have elected to find a violation under R.C. 1345.02, as well. We need not discuss this further, because a defendant must act "knowingly" in order for attorney fees to be awarded, whether the violation occurs under R.C. 1345.02 or under R.C. 1345.03.

{¶ 67} Charger's second assignment of error is overruled.

## IV

{¶ 68} All of Charger's assignments of error having been overruled, the judgment of the trial court is affirmed.

Judgment affirmed.

GRADY and FROELICH, JJ., concur.